**CASE NO. 26–5555**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

KILMAR ARMANDO ABREGO GARCIA,
Defendant-Appellee.

On Appeal from the United States District Court
for the Middle District of Tennessee, Nashville Division
Waverly D. Crenshaw, Jr., U.S. District Judge, No. 3:25-cr-00115

**OPENING BRIEF OF THE UNITED STATES OF AMERICA**

BRADEN H. BOUCEK
United States Attorney for the Middle
District of Tennessee
United States Attorney's Office
719 Church Street, Suite 3300
Nashville, Tennessee 37203
(615) 736-5151

STANLEY E. WOODWARD, JR.
Associate Attorney General

MICHAEL WEISBUCH
Senior Counsel to the
Associate Attorney General

ANNA L. EDWARDS
Counsel to the Associate
Attorney General

Attorneys for Appellant

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

STATEMENT REGARDING ORAL ARGUMENT ........ viii

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 2

INTRODUCTION ........ 3

STATEMENT OF THE CASE ........ 6

I. Factual Background ........ 6

II. District Court Proceedings ........ 11

SUMMARY OF THE ARGUMENT ........ 17

STANDARD OF REVIEW ........ 21

ARGUMENT ........ 22

I. The District Court Erred In Applying The Presumption Of Vindictiveness ........ 24

A. The Charging Prosecutor Had No Stake In The Civil Deportation Matter ........ 25

1. The District Court Did Not Find That The Prosecutorial Decision Maker Had A Stake In Abrego's Removal Challenge ........ 26

2. To Presume Vindictiveness, The Prosecutorial Decision Maker, Not The Government As A Whole, Must Have A Stake In The Protected Conduct ........ 27

B. Presumptive Vindictiveness Is Improper For Initial Indictments ........ 33

C. The Decision To Indict Abrego Was Objectively Reasonable ...................40

1. The Charging Decision Was Supported By Legitimate Prosecutorial Concerns Surrounding The Defendant's Return To The Country .............42

2. The Court Conflated Factual Causation With Punishment .........................43

3. Blanche's Statements Do Not Suggest Animus ........................................48

II. Even If Presuming Vindictiveness Were Proper, The District Court Erred In Holding The Prosecution Insufficiently Rebutted It ..........................................51

A. The Prosecution Rebutted Any Presumption With Objective, Independent Evidence ...........................................................................................51

B. The District Court Erred In Excluding New Evidence As Irrelevant To The Charging Decision ...................................................................55

CONCLUSION ...........................................................................................58

CERTIFICATE OF COMPLIANCE ................................................................60

CERTIFICATE OF SERVICE .......................................................................61

DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS ..................62

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abrego Garcia v. Noem*,
777 F. Supp. 3d 501 (D. Md. 2025) ........................................................8

*Abrego Garcia v. Noem,*
No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) ..............................8, 9

*Alabama v. Smith*,
490 U.S. 794 (1989) ........................................................................6, 25

*Blackledge v. Perry*,
417 U.S. 21 (1974) .................................................................. 30, 31, 35

*Bordenkircher v. Hayes,*
434 U.S. 357 (1978) ........................................................................42

*Bragan v. Poindexter,*
249 F.3d 476 (6th Cir. 2001) ........................................................ passim

*Garza v. Idaho*,
586 U.S. 232 (2019) ........................................................................39

*Gauntlett v. Kelly*,
849 F.2d 213 (6th Cir. 1988) ........................................................32

*Hardwick* v. *Doolittle*,
558 F.2d 292 (5th Cir. 1977) ........................................................30

*Hartman v. Moore*,
547 U.S. 250 (2006) .................................................................. 24, 43

*In re United States*,
398 F.3d 615 (7th Cir. 2005) ........................................................57

*Maddox v. Elzie*,
238 F.3d 437 (D.C. Cir. 2001) ........................................................30

*Margolin v. NAIJ*,
146 S. Ct. 1285 (2026) ........ 61

*Murray v. UBS Sec., LLC*,
601 U.S. 23 (2024) ........ 48

*Noem v. Abrego Garcia*,
145 S. Ct. 1017 (2025) ........ 7, 8, 44

*North Carolina v. Pearce*,
395 U.S. 711 (1969) ........ 25

*QueerDoc, PLLC v. DOJ*,
No. 25-7384, 2026 WL 2359440 (9th Cir. Aug. 14, 2026) ........ 50

*Town of Newton v. Rumery*,
480 U.S. 386 (1987) ........ 39, 60

*Trump v. United States*,
603 U.S. 593 (2024) ........ 39

*United States v. Adams,*
870 F.2d 1140 (6th Cir. 1989) ........ passim

*United States v. Adams,*
38 F.3d 1217, 1994 WL 589509 (6th Cir. 1994) ........ 30, 33, 37, 56

*United States v. Armstrong*,
517 U.S. 456 (1996) ........ 24, 32, 38, 57

*United States v. Ball*,
18 F.4th 445 (4th Cir. 2021) ........ 34, 40

*United States v. Bout*,
731 F.3d 233 (2d Cir. 2013) ........ 34

*United States v. Campbell*,
410 F.3d 456 (8th Cir. 2005) ........ 52

*United States v. Chappell*,
779 F.3d 872 (8th Cir. 2015) ....................................................................30

*United States v. Cooper*,
461 F.3d 850 (7th Cir. 2006) ....................................................................38

*United States v. Esposito*,
968 F.2d 300 (3d Cir. 1992)............................................................ 20, 43, 47, 48

*United States v. Goodwin*,
457 U.S. 368 (1982)..................................................................................... passim

*United States v. Griffin*,
617 F.2d 1342 (9th Cir. 1980) ....................................................................43

*United States v. Hastings*,
126 F.3d 310 (4th Cir. 1997) ....................................................................30

*United States v. Howell*,
17 F.4th 673 (6th Cir. 2021) ....................................................................20

*United States v. Iossifov*,
45 F.4th 899 (6th Cir. 2022) ....................................................................18

*United States v. LaDeau*,
734 F.3d 561 (6th Cir. 2013) ..................................................................... passim

*United States v. Loines*,
165 F.4th 475 (6th Cir. 2026) ........................................................... 6, 20, 25

*United States v. Lovasco*,
431 U.S. 783 (1977)....................................................................................59

*United States v. Marion*,
404 U.S. 307 (1971)....................................................................................59

*United States v. Mathis*,
173 F.3d 857 (Table), 1999 WL 98465 (6th Cir. Jan. 29, 1999)..........................29

*United States v. Mincy*,
No. 24-4019, 2025 WL 3269350 (6th Cir. Nov. 24, 2025) ........................ passim

*United States v. S. Poverty L. Ctr., Inc.*,
No. 2:26-CR-139, 2026 WL 2280675 (M.D. Ala. Aug. 7, 2026) ............... passim

*United States v. Sanders*,
211 F.3d 711 (2d Cir. 2000).................................................................53

*United States v. Spears*,
159 F.3d 1081 (7th Cir. 1998) ........................................................ 30, 40

*United States v. Suarez*,
263 F.3d 468 (6th Cir. 2001) ........................................................ 23, 58

*United States v. Villa*,
70 F.4th 704 (4th Cir. 2023) ........................................... 29, 35, 51, 59

*United States v. White*,
972 F.2d 16 (2d Cir. 1992)..................................................................38

*United States v. Williams*,
47 F.3d 658 (4th Cir. 1995) ................................................................38

*United States v. Wilson*,
262 F.3d 305 (4th Cir. 2001) ................................................... 30, 38, 43

*United States v. Zakhari*,
85 F.4th 367 (6th Cir. 2023) ......................................................... passim

*Unites States v. Texas*,
599 U.S. 670 (2023)...........................................................................39

*Wayte v. United States*,
470 U.S. 598 (1985)....................................................................... passim

**Statutes**

8 U.S.C. § 1324 ............................................................................... vii

18 U.S.C. § 3231 ....................1

18 U.S.C. § 3731 ....................1

28 U.S.C. § 516 ....................58

**Rules**

Fed. R. App. P. 4(b)(1)(B) ....................1

Fed. R. App. P. 26(a)(1)(C) ....................1

Fed. R. Crim. P. 33(a) ....................59

Fed. R. Crim. P. 33(b) ....................22, 59

Fed. R. Crim. P. 33(b)(1) ....................18

**Other Authorities**

4 Wayne R. LaFave et al., *Criminal Procedure* § 13.5(a) ....................20, 35

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests oral argument. In this case, the district court dismissed a grand jury's indictment of defendant-appellee Kilmar Abrego Garcia for serious federal offenses—human smuggling for financial gain and conspiracy to commit the same, in violation of 8 U.S.C. § 1324. And the case involves important questions regarding the scope and application of a presumption of prosecutorial vindictiveness. Oral argument would materially assist the Court in resolving this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3731. The district court issued the order and memorandum granting the defendant's motion to dismiss the indictment on May 22, 2026, and the United States timely appealed on June 22, 2026. *See* Order, R.313, PageID#5114; Mem.Op., R.312, PageID#5082–5113; Notice of Appeal, R.314, PageID#5118;[1] *see also* Fed. R. App. P. 4(b)(1)(B), 26(a)(1)(C).

[1] This brief cites documents from Case No. 3:25-cr-00115 using the form "[Document Description], R.__, # [PageID#]." *See* 6 Cir. R. 28(a)(1).

## STATEMENT OF THE ISSUES

**1.** When assessing a vindictive prosecution claim, a court may apply a rebuttable presumption of vindictiveness only if the prosecutorial decision maker had a personal stake in the defendant's prior exercise of a legal right and if the prosecutor's conduct was objectively unreasonable. Here, after courts ordered Kilmar Abrego Garcia's return to the country, the United States reopened a criminal investigation into Abrego that it had previously closed following his removal. Ultimately, after obtaining new evidence against Abrego, the Acting U.S. Attorney for the Middle District of Tennessee secured an indictment on human smuggling charges. The district court applied a presumption of vindictiveness based on (i) this series of events, (ii) public statements by then-Deputy Attorney General Todd Blanche stating that prosecution was warranted to protect the public in light of the court orders, and (iii) basic communications between an attorney in the Office of the Deputy Attorney General and the Acting U.S. Attorney. Did the district court err in applying a presumption of vindictiveness to the initial charging decision?

**2.** At the rebuttal stage, the district court refused to consider evidence that the Acting U.S. Attorney (whose motives are not questioned) was not induced to make any charging decision, or any new evidence obtained after the criminal investigation was reopened. Did the district court err in concluding that the United States failed to rebut any presumption of vindictiveness?

## INTRODUCTION

When an illegal alien is suspected of committing crimes in the United States, the federal government can deal with the resulting threat to law and order in several ways. The government can seek to remove the illegal alien from the United States, such that he can no longer engage in criminal conduct here. Or the government can prosecute the illegal alien to punish him and deter him and others. The government can also pursue both options. Criminal illegal aliens are often prosecuted and then removed upon their release from prison. And should the government first pursue removal only, the process may hit a snag. If that happens, the government need not give up on addressing the problem. It can instead change course and prosecute. There is nothing remarkable, let alone unlawful, about that scenario, even if the antecedent removal dispute is controversial.

In 2022, Tennessee police stopped a vehicle driven by defendant Kilmar Abrego Garcia, an illegal alien and national of El Salvador, and reported him to the Department of Homeland Security (DHS) based on evidence that he was engaged in human smuggling. Among other things, Abrego's stated route of travel made no sense, and the vehicle was full of passengers who, despite being on a long-distance road trip, had no luggage. But DHS's investigation stalled and then, shortly after Abrego was removed to El Salvador in 2025, was closed. After a federal court in Maryland ordered DHS to facilitate Abrego's return, however, DHS reopened its

investigation. And the Acting U.S. Attorney for the Middle District of Tennessee, Robert McGuire, separately began investigating the 2022 traffic stop. He ultimately gathered strong additional evidence of Abrego's guilt and obtained a grand-jury indictment of Abrego for human smuggling for financial gain.

In the decision under review, the district court dismissed the indictment on the theory that the government brought this prosecution against Abrego in retaliation for his civil suit challenging his removal to El Salvador. Under the Due Process Clause, a defendant "may challenge the government's charging decisions for actual or presumptive vindictiveness." *United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023). The district court acknowledged that the evidence was insufficient to establish *actual* prosecutorial vindictiveness. (Mem.Op., R. 312, PageID#5095). But it applied a presumption of vindictiveness to the initial indictment, a measure no court has taken before, which required findings that the prosecutor had a "personal stake" in Abrego's removal suit, *United States v. Goodwin*, 457 U.S. 368, 383 (1982), and acted "unreasonabl[y]" in bringing charges, *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013).

The district court gravely erred under both prongs of the presumptive-vindictiveness inquiry. First, it is undisputed that McGuire himself had no stake in Abrego's removal suit, and there is no evidence—despite the district court's

(unfounded) authorization of extensive discovery—that anyone else in the government pressured or induced McGuire to charge Abrego. Second, there was nothing unreasonable about indicting Abrego for the serious crimes charged. Although the district court viewed the timing of the charges—after the government had been ordered to facilitate Abrego's return to the United States—as suspicious, Abrego's impending return gave the government an obvious legitimate motive to prosecute him. For that and other reasons, including its acquisition of significant new evidence against Abrego, the government also easily rebutted any presumption of vindictiveness.

The Supreme Court and this Court have made clear that, given its potential to "block a legitimate response to criminal conduct," *Goodwin*, 457 U.S. at 373, the "presumption of vindictiveness has a 'limited' scope," *United States v. Loines*, 165 F.4th 475, 487 (6th Cir. 2026) (quoting *Alabama v. Smith*, 490 U.S. 794, 799 (1989)). Yet the district court's broad and amorphous conception of presumptive vindictiveness would dangerously expand that doctrine, necessitating unwarranted probing of the mental states and motivations of government officials and inviting courts to usurp the prosecutorial discretion constitutionally committed to the Executive Branch. This Court should reverse.

## STATEMENT OF THE CASE

### I. Factual Background

Abrego was stopped by Tennessee Highway Patrol ("THP") in Putnam County on November 30, 2022. (Tr., R.300, PageID#4824, 4826, 4838, 4840, 4862). His suspicious behavior suggested he might be engaged in human smuggling. (*Id.*, PageID#4874). For instance, the car was full of people who were supposedly on a trip to Maryland, yet they had no luggage. (*Id.*, PageID#4873). The car was registered to Hernandez Reyes, a convicted human-trafficker. (*Id.; see also* Tr., R.61, PageID#574). And Abrego claimed to be driving from St. Louis to Baltimore, but Putnam County was nowhere near that route. (Tr., R.300, PageID#4873–74). THP let him go and alerted an FBI tip line. (*Id.*, PageID#4825–26, 4863–64). The Baltimore investigative component of DHS, HSI-Baltimore, opened an investigation into Abrego's involvement with a transnational gang, MS-13, but the investigation remained open for a few years without further event. (*Id.*, PageID#4829–4830, 4839).

In March 2025, DHS arrested Abrego and deported him to El Salvador, despite an immigration judge's order barring his removal to that country. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). Abrego filed suit through his wife in the District of Maryland, and that court ordered DHS to facilitate Abrego's return to the United States. *Id*. The Maryland court was skeptical that the government could

back up its claim that Abrego was a member of MS-13, a designated terrorist organization. *See Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 508 (D. Md. 2025) ("unsubstantiated allegation"); *id.* at 508 n.5 ("a vague, uncorroborated allegation"); *id.* at 518 ("without any evidence"). On April 10, 2025, the Supreme Court granted in part and denied in part the government's application for a stay of the district court's order. *Abrego Garcia*, 145 S. Ct. at 1018. The Supreme Court acknowledged the government's belief that Abrego is a criminal and a member of MS-13, and "that his return to the United States would pose a threat to the public." *Id.* But the Court upheld the Maryland court's order requiring the government to facilitate Abrego's return. *Id.* The Maryland court then directed the government to facilitate Abrego's return "as soon as possible," and the Fourth Circuit denied a stay on April 17, 2025. *Abrego Garcia v. Noem,* No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025). In doing so, the Fourth Circuit noted that the government would be expected to back up its claims about Abrego's criminality upon his return (albeit in further immigration proceedings). *See id.* at *1.

HSI-Baltimore had closed the criminal investigation of Abrego on April 1, 2025, following his deportation on March 15, 2025. (Tr., R.300, PageID#4926–27). HSI-Baltimore reopened the investigation on April 17, 2025, following the Fourth Circuit's denial of the stay. *Id.*

Robert McGuire was the Acting United States Attorney for the Middle District of Tennessee in April and May of 2025. (Tr., R.300, PageID#4858). He is the prosecutor who decided to seek charges against Abrego. (*Id.*, PageID#4858–59, 4989). On April 27, 2025, Rana Saoud, the Special Agent in Charge of HSI-Nashville, called McGuire and told him that she learned from a news source (*The Tennessee Star*) about Abrego's traffic stop.[2] (Tr. R.300, PageID#4862). Agent Saoud informed McGuire that HSI had already interviewed other potential witnesses. (*Id.*, PageID#4831, 4863; *see also id.*, PageID#4867–68, 4870, 4923). One witness was Hernandez Reyes, who was interviewed on April 24, 2025, by HSI-Baltimore. (*Id.*, PageID#4923, 4932). He told interviewers that Abrego worked in a human-smuggling operation as a driver. (*Id.*, PageID#4924).

McGuire began looking into the "potential human smuggling operation" that night, calling the head of THP. (*Id.*, PageID#4863–64). He wanted to learn "about this traffic stop" and whether there "was there body-worn camera or dash camera

[2] *The Tennessee Star* ran a series of articles on the defendant's traffic stop beginning on April 16, 2025. *See* Tom Pappert, *Biden's FBI Ordered TN Highway Patrol to Release 'Maryland Man' Recently Deported to El Salvador After He Was Detained in 2022 Traffic Stop on Suspicion of Human Trafficking*, Tennessee Star (Apr. 16, 2025), https://tennesseestar.com/justice/bidens-fbi-ordered-tn-highway-patrol-to-release-maryland-man-recently-deported-to-el-salvador-after-he-was-detained-in-2022-traffic-stop-on-suspicion-of-human-trafficking/tpappert/2025/04/16/.

and how fast . . . could [he] see it." (*Id.*, PageID#4864). Upon review, McGuire was "immediately struck" by how similar the conduct was to other human-smuggling cases he had worked on. (*Id.*, PageID#4873–74).

Later that evening, McGuire received an email from Aakash Singh, an attorney in the Office of the Deputy Attorney General (ODAG) who is responsible for coordinating with U.S. Attorney's Offices across the country. (*Id.*, PageID#4864–66). The email addressed logistical issues regarding witness interviews. (*Id.*, PageID#4864–65, 4567–68, 4930–31; *see also* (Gov't Ex. 1 (Feb. 26, 2026 Hr'g), R.315-1, PageID#5120)). As McGuire directed the investigation, he coordinated with and updated Singh. (Order, R.312, PageID#5088–5092 (timeline of events and communications)).

McGuire acted quickly to further the investigation. (Tr., R.300, PageID#4873–75). His prosecution team reinterviewed Hernandez Reyes multiple times. (*Id.*, PageID#4988). They also interviewed a new witness in Texas who had independent information about the human-smuggling scheme. (*Id.*, PageID#4854, 4988). That witness was not in custody, did not "have an obvious motive to try and fabricate a story," and corroborated the testimony of Hernandez Reyes. (*Id.*, PageID#4876). She detailed her texting relationship with Abrego and his numerous

invitations for her to join him on his "trips" even though she was a minor. (*Id.*, PageID#4987).

Additional evidence pointed to Abrego's criminal conduct. Hernandez Reyes's phone contacts described Abrego as "chauffeur." (*Id.*, PageID#4878). McGuire obtained phone records showing that Abrego called Hernandez Reyes during the recorded traffic stop. (*Id.*). Abrego had told the trooper he was calling "his boss," to whom the car was registered. (*Id.*; *see also* PageID#4879 ("[T]he records showed he had called him [Hernandez Reyes] during the traffic stop[,] [which] was important corroboration [of] what Mr. Hernandez Reyes was saying.")). And McGuire obtained license plate reader data showing that the car Abrego had been driving was not previously in St. Louis as Abrego had told the trooper. (*Id.*, PageID#4877). Instead, it had been in Texas. (*Id.*). Another criminal defendant involved in the same scheme provided additional information that matched the other cooperator's. (*Id.*, PageID#4879–80).

Consistent with normal practice, McGuire's office started to sketch out potential charges after the initial days of the investigation. (*Id.*, PageID#4889, 4894, 4976). McGuire started drafting a criminal complaint on April 29, 2025, but ultimately opted to seek an indictment instead. (*Id.*, PageID#4895). By April 30,

2025, (*see id.*, PageID#4933), he was preparing an indictment for submission the following week. (*Id.*, PageID#4935).

McGuire presented the evidence to the grand jury in May 2025, after coordinating timing with Singh. (*Id.*, PageID#4896, 4899). When McGuire communicated with Singh, he was not asking for permission; rather, he wanted to make sure that Department officials were on the same page about sealing the indictment and ready for the publicity given the public attention Abrego was already receiving. (*Id.*, PageID#4896, 4900–01). McGuire's office also needed help bringing Abrego back from El Salvador before the speedy trial clock elapsed. (*Id.*, PageID#4897–4898). On May 21, 2025, a Middle District of Tennessee Grand Jury returned a two-count indictment charging Abrego with conspiracy to transport aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and unlawful transportation of undocumented aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). (Indict., R.3, PageID#3–12).

## II. District Court Proceedings

Abrego was returned to the United States on June 6, 2025. (Tr., R.300, PageID#4991). In August, he moved to dismiss the indictment for vindictive and selective prosecution. (Mot. Dismiss, R.104, PageID#1227; Mem. Supp., R.105, PageID#1230–1268). He argued the prosecution was actually and presumptively

vindictive, and that he was entitled to discovery and a hearing. (Mem. Supp., R.105, PageID#1261–1262).

In opposing the motion, the United States submitted declarations signed by McGuire and members of the Joint Task Force Vulcan, DOJ's task force for human trafficking. (Aff. Supp. Resp. Mot. Dismiss, R.121-1, PageID#1382–87; Suppl. Aff. Supp. Resp. Mot., R.178-1). The declaration explained that McGuire received no direction from the White House, DOJ, or anyone else to seek an indictment. (Suppl. Aff. Supp. Resp. Mot., R.178-1, PageID#1817 ¶4).

The district court reserved ruling on the motion to dismiss but ordered discovery and an evidentiary hearing.[3] (Order, R.140, PageID#1532). It reasoned that Abrego had not shown actual vindictiveness but flagged a televised interview of Blanche as concerning. (Mem.Op., R.138, PageID#1520). The court characterized Blanche as having "revealed that the government started 'investigating' Abrego after 'a judge in Maryland . . . questioned' the government's decision, found that it 'had no right to deport him,' and 'accus[ed] [the government] of doing something wrong.'" (*Id.*, PageID#1519 (alterations in district court opinion)). During the relevant portion of the interview, Blanche said:

[3] The district court did not address Abrego's selective prosecution claim. *See* Mem.Op., R.138.

> A: . . . We deported him, we got him out of here. And a judge in Maryland and many members of Congress—we had a Senator fly down to meet with him—questioned that decision and said oh no, he's just a family man. And so we said okay, we'll look into it. And when we started looking into it and we have great law enforcement officers and prosecutors who started studying this man and investigating him, and what we found is that we were right. We were right. He is a criminal who should be deported. And at the end of the day we have a responsibility to protect the American people and to keep our country safe. And so he was indicted, and he was indicted on very serious charges. It is very serious conduct that we learned about during our investigation. And so he has returned, but he has not returned for any other reason than to face justice. Period.
>
> ***
>
> A: . . . In this case, we had a judge in Maryland tell us oh no, there's not any evidence that he's a member of MS-13, you have no right to deport him. So what should we do as a Department of Justice when a judge is accusing us of doing something wrong? We have an obligation to everyone, including you, to investigate it. And that's exactly what we did . . . .[4]

Regardless, the court found that Blanche's statement (however framed) and others "fall short" of showing actual vindictiveness "because they require an inference tying them to actual decisionmakers" like McGuire. (*Id.*, PageID#1521). Notably, the court did not rule that McGuire said or did anything vindictive.

Instead, the court viewed the purportedly questionable motives of others as sufficient to "taint" the prosecution. (*Id.*, PageID#1525). The court inferred "a realistic likelihood that senior DOJ and DHS officials may have induced

[4] *Kilmar Abrego Garcia was Indicted on 'very serious' charges, US deputy attorney general says*, Fox News (June 6, 2025), https://perma.cc/S58L-75EY.

. . . McGuire (albeit unknowingly) to criminally charge Abrego." (*Id.*, PageID#1526). It also found the timing of reopening the investigation, after Abrego had been ordered returned, suspicious. (*Id.*, PageID#1526–27). The court concluded that Abrego's showing was sufficient to presume vindictiveness and ordered discovery. (*Id.*, PageID#1521–22, 1528).

The district court held an evidentiary hearing on February 26, 2026, with Agent Saoud and McGuire testifying on behalf of the government. (Tr., R.300, PageID#4818). Agent Saoud testified that she called McGuire to alert him of a potential crime in the district, (*see id.*, PageID#4826), after which the investigation began in earnest. (*Id.*, PageID#4827). Although she kept her superiors informed given Abrego's high profile, they never directed the investigation or told her to charge the defendant. (*Id.*, PageID#4832–34, 4846–47).

McGuire testified that he alone made the decision to investigate and seek an indictment. (*Id.*, PageID#4858–59, 4989). Neither Blanche, his office (ODAG), DOJ, the White House, or DHS directed, asked, or insinuated that he should seek an indictment. (*Id.*, PageID#4858–59). Throughout the investigation, McGuire kept ODAG updated of the progress of his investigation, but the communications were largely "a one-way street" involving logistics. (*Id.*, PageID#4969; *see id.*, PageID#4950 ("It was a one-way conversation.")). Notably, the Justice Manual

mandates communications of this sort for high-profile cases. (*Id.*, PageID#4885–86; *see* Gov't Ex. 2, Justice Manual § 1-13.000). ODAG also helped arrange interviews with witnesses and provided McGuire with additional information. (*Id.*, PageID#4868). McGuire further testified:

> Q: And so no one outside of Nashville provided any input whatsoever to the charging documents?
>
> A: No, sir.
>
> Q: Not Mr. Singh?
>
> A: No, sir.
>
> Q: And have you ever spoken to Mr. Blanche directly about this prosecution?
>
> A: About the charges? No. About the charging decision, that was my decision. I never talked to Mr. Blanche, [then Principal Associate Deputy Attorney General] Mr. [Emil] Bove, anybody at Homeland Security that wasn't the case agent and the SAC [Special Agent in Charge]. You know, the charging decision that I made was—I didn't talk to any of those people. And I really kind of didn't want to, because I wanted to make it—I wanted to feel good about it on my own.

(*Id.*, PageID#4983-84). McGuire ultimately made his decision based on "the proof," even though it was against the recommendation of his Criminal Chief, Ben Schrader. (*Id.*, PageID#4903–04).

The district court nevertheless ruled that the prosecution was vindictive and dismissed the indictment. (Mem.Op., R. 312, PageID#5082–5113). After again

ruling that the facts did not show actual vindictiveness, (*see id.*, PageID#5095), the court applied the doctrine of presumptive vindictiveness for three reasons. First, the court was suspicious of the fact that HSI reopened the smuggling investigation after the Maryland court had ordered Abrego's return to the United States because, according to the district court, the additional evidence could have been gathered "earlier through due diligence." (*Id.*). Second, Blanche had publicly said "that the Executive Branch began 'investigating' the defendant after a judge in Maryland 'questioned' the Executive Branch's decision to deport him." (*Id.* PageID#5098). Third, the district court relied on Singh's purported "sustained oversight" of McGuire and the charging process, "[n]otwithstanding McGuire's purported belief that he was the sole decisionmaker." (*Id.*, PageID#5095–102).

The district court then concluded that the government failed to rebut the presumption of vindictiveness. It did not address the government's interest in prosecuting a criminal alien that the government had removed but been ordered to return. Instead, the court focused its analysis on the government's reliance on newly discovered evidence. (*Id.*, PageID#5102). Even though the court acknowledged that "[t]he evidence was new to Mr. McGuire," the court ruled that such evidence could have been discovered "with due diligence," (*id.*, PageID#5105), citing the standard applicable to defendants with respect to motions for a new trial. (*Id.,* PageID#5103

(citing Fed. R. Crim. P. 33(b)(1) and *United States v. Iossifov*, 45 F.4th 899, 920 (6th Cir. 2022))). The court also rejected McGuire's insistence that he had acted independently, and that no higher-ups had told him to charge Abrego. It viewed these statements as "subjective good faith explanations about his own motives" that were irrelevant to the analysis, which must rely on "objective evidence." (*Id.*, PageID#5111). The court also characterized McGuire's interactions with Singh as amounting to "pressure from DOJ." (*Id.*, PageID#5110).

In concluding that the prosecution was vindictive, the court made clear the core of its reasoning: "Only after Abrego succeeded in vindicating his rights" in the civil immigration challenge "did the Executive Branch reopen [its] investigation." (*Id.*, PageID#5113). "Absent Blanche's tainted investigation, Agent Saoud would not have called McGuire, Singh would not have brought him into the fold, and McGuire would not have sought an indictment against Abrego." (*Id.*).

## SUMMARY OF THE ARGUMENT

The district court's order dismissing the charges against Abrego is erroneous at every step.

**I.A.** McGuire had no stake in the prior civil removal challenge. The district court did not find otherwise. Instead, it applied a "vindictive taint" theory of presumptive vindictiveness to the Executive Branch as a whole. In doing so, the court violated the principle that a prosecutor must have a "*personal* stake" in the

defendant's protected conduct for the presumption of vindictiveness to apply. *Goodwin*, 457 U.S. at 383 (emphasis added). Even if it were relevant whether someone else with a retaliatory motive had "induced" McGuire to bring charges, *United States v. Adams* (*Adams I*), 870 F.2d 1140, 1146 (6th Cir. 1989) (addressing such a theory in the context of an *actual* vindictiveness claim), the district court did not hold (and could not have held) that McGuire was "prevail[ed] upon," such that he would not have brought a charge but for some official inducement. *Adams I*, 870 F.2d at 1146. Instead, the court relied only on Singh's purported "oversight" and the hierarchal structure of the Executive Branch in a general sense. (Mem.Op., R.312, PageID#5108–5111).

**I.B.** The district court's flawed reasoning underscores why the doctrine of presumptive vindictiveness "does not extend to the . . . pretrial phase" of proceedings generally, *United States v. Mincy*, No. 24-4019, 2025 WL 3269350, at *7 (6th Cir. Nov. 24, 2025) (Readler, J., concurring), and certainly not to an initial indictment. Indeed, "nearly every other circuit refuses to apply a presumption of vindictiveness in the pretrial context." *Id.* That follows from the "personal stake" and "unreasonable" conduct requirements that "trigger this presumption." *Loines*, 165 F.4th at 488 (6th Cir. 2026) (quoting *United States v. Howell*, 17 F.4th 673, 687 (6th Cir. 2021)). Because prosecutors generally have no stake in a defendant's

conduct before charges are brought, and initial charging decisions are policy-laden judgments ill-suited to judicial second-guessing, it is simply not possible to prove based on the factual circumstances that in "all [like] cases," the sole reason for the charges is likely vindictiveness. *Goodwin*, 457 U.S. at 381. Thus, "any challenge to the *initial* decision to prosecute . . . should require proof by the defendant that a vindictive motive *actually* exists." 4 Wayne R. LaFave et al., *Criminal Procedure* § 13.5(a) (second emphasis added).

**I.C.** The district court also erred by concluding that the prosecutor's conduct in this case was unreasonable. The decision to indict Abrego was supported by "legitimate reason[s]." *United States v. Esposito*, 968 F.2d 300, 305 (3d Cir. 1992) (collecting cases). The government had an obvious interest in protecting the public by prosecuting Abrego after courts ordered his return. There is nothing suspect about electing not to prosecute a criminal alien and instead remove them, but upon their court-ordered return to prosecute them for criminal conduct that poses a risk to public safety. The government also had a legitimate interest in confirming whether Abrego was a threat to public safety, including in light of new evidence.

Further, the timeline of the investigation and Blanche's public statements confirm, rather than undermine, those legitimate motives. The government closed its investigation after Abrego was deported, and when Abrego filed his civil challenge,

the government did not re-open the investigation until Abrego had been ordered returned. Blanche's statements (to the extent they could ever be relevant) explained that the government was seeking to protect the public and confirm its prior assertions about Abrego's criminal activity. The district court simply confused prosecutorial decisions that arose because of the consequences of the civil immigration challenge with a desire to punish Abrego for initiating that challenge. This straightforward mistake infected the court's entire analysis and compels reversal. Indeed, this Court could resolve the appeal based on that obvious error alone.

**II.** Even assuming a presumption of vindictiveness could apply, the government easily "rebut[ted] it." *Bragan v. Poindexter,* 249 F.3d 476, 482 (6th Cir. 2001). In addition to the above-described legitimate rationales, the government provided objective evidence that McGuire, whose motives are not in question, acted independently. The district court wrongly characterized this evidence as subjective. But the pertinent testimony was not about what was in McGuire's mind; it was about his objective reasons for charging and what others at DOJ did (or did not) say to him as the process unfolded. McGuire gave logical reasons for charging and was unequivocal that neither Blanche nor Singh had any input in the charging decision itself, even as Singh provided routine coordination from DOJ headquarters (as is typical in any high-profile case and required by the Justice Manual).

The district court also ignored the government's newly discovered evidence, which is independently sufficient to rebut any presumption of vindictiveness. The district court applied a "due diligence" standard based on Rule 33 of the Federal Rules of Criminal Procedure. That rule, which governs *defendants'* motions for new trials, is plainly inapt in this context. More fundamentally, district courts are not equipped to second-guess how efficiently criminal investigations have unfolded, at least absent any indication of strategic delay aimed at prejudicing a defendant. Yet the district court took issue with the Executive Branch's inherently policy-laden, resource-constrained judgments with respect to evidence gathering.

More generally, the district court relied on a host of dubious assessments of discretionary Executive Branch functions, covering virtually every aspect of the charging decision. As a result, the court's reasoning threatens a serious and untenable encroachment on prosecutorial decision making far beyond this case.

This Court should reverse.

## STANDARD OF REVIEW

This Court reviews a district court's decision "to dismiss an indictment" as vindictive "for an abuse of discretion." *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001). A district court abuses its discretion when it "relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Ladeau*,

734 F.3d at 565–566 (quotation omitted). Thus, "a district court commits error requiring reversal if its determination whether to dismiss an indictment for prosecutorial vindictiveness depends upon a misapplication of pertinent law." *Id.* at 566. Factual findings are reviewed for clear error. *See id.*

## ARGUMENT

The district court erred in dismissing the indictment. Under the Due Process Clause, "defendants may challenge the government's charging decisions for actual or presumptive vindictiveness." *Zakhari*, 85 F.4th at 379. But prosecutorial vindictiveness is limited to scenarios where the government seeks "[t]o punish a person because he has done what the law plainly allows him to do." *Goodwin*, 457 U.S. at 372. Of course, "[t]he imposition of punishment is the very purpose of virtually all criminal proceedings." *Id.* And "the validity of a pretrial charging decision must be measured against the broad discretion held by the prosecutor to select the charges against an accused." *Id.* at 380 n.11. Accordingly, "[a] charging decision does not levy an improper 'penalty' unless it results *solely* from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." *Id.* (emphasis added). Any other approach would negate "the longstanding presumption of regularity accorded to prosecutorial decisionmaking" and the principle that "judicial intrusion into executive discretion of such high order should be minimal."

*Hartman v. Moore*, 547 U.S. 250, 263 (2006); *see United States v. Armstrong*, 517 U.S. 456, 464 (1996).

A criminal defendant can seek to prove that the government was motivated solely by the defendant's exercise of a protected right in two ways. First, a defendant can try to show "actual vindictiveness—that is, objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." *LaDeau*, 734 F.3d at 566 (citation modified). Second, because "[m]otives are complex and difficult to prove," a defendant may ask a court "to presume an improper vindictive motive." *Goodwin*, 457 U.S. at 373. But the "presumption of vindictiveness has a 'limited' scope," *Loines*, 165 F.4th at 487 (quoting *Smith*, 490 U.S. at 799). "Given the severity of such a presumption," "which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct," the presumption applies "only in cases in which a reasonable likelihood of vindictiveness exists." *Goodwin*, 457 U.S. at 373.

That does not mean the presumption applies whenever a defendant presents some (but not enough) evidence of actual vindictiveness. Rather, "the Supreme Court has limited the application of a presumption to situations involving a specific fact pattern or series of fact patterns that would, no matter when or where that pattern or series appeared, *necessarily* give rise to a 'reasonable likelihood

of vindictiveness.'" *United States v. S. Poverty L. Ctr., Inc.*, No. 2:26-CR-139, 2026 WL 2280675, at *9 (M.D. Ala. Aug. 7, 2026) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 725–26 (1969)). To ensure the "prophylactic" presumption applies only in "narrow circumstances," a defendant must establish a fact pattern demonstrating "(1) the prosecutor has some stake in deterring the [defendant's] exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable." *LaDeau*, 734 F.3d at 566. Even if the defendant makes that showing, the government can "present evidence sufficient to rebut the presumption" through "objective, on-the-record explanations." *Bragan*, 249 F.3d at 482.

The district court erred in applying the presumption of vindictiveness and in holding that the government failed to rebut any such presumption.

## I. The District Court Erred In Applying The Presumption Of Vindictiveness.

The district court's decision to apply the presumption of vindictiveness is wrong for several reasons. To start, the presumption cannot apply here because the prosecutor had no stake in Abrego's civil challenge to his removal, an entirely separate legal proceeding. Indeed, this case demonstrates why the presumption can never apply to an *initial* charging decision (rather than a pre-trial or later decision to *add* charges). But even assuming the relevant personal stake, the prosecutor's

conduct was not unreasonable. To the contrary, the government's legitimate prosecutorial purpose is self-evident: Abrego's return to the country revived the threat to the public that his deportation had negated and heightened the government's interest in confirming what it had said all along about Abrego's criminal conduct. The district court's amorphous reasoning would read the limiting requirements out of the presumptive-vindictiveness doctrine and invite post hoc policing by the judiciary of discretionary prosecutorial and investigative decisions.

### A. The Charging Prosecutor Had No Stake In The Civil Deportation Matter.

The presumption of vindictiveness does not fit this initial charging decision because the prosecutor lacked a cognizable stake in the defendant's preceding assertion of a legal right. It is undisputed that McGuire made the decision to indict Abrego. And it is undisputed that McGuire had no stake in or connection with Abrego's removal challenge in a separate civil case in a faraway district. Tellingly, the district court did not even purport to analyze McGuire's stake in that civil case. Instead, the court appeared to attribute a stake to the Executive Branch writ-large by adopting an unprecedented "vindictive taint" theory. Ultimately, the district court's reasoning demonstrates why it is never appropriate to presume vindictiveness with respect to an initial charging decision.

### 1. The District Court Did Not Find That The Prosecutorial Decision Maker Had A Stake In Abrego's Removal Challenge.

To presume vindictiveness, a prosecutor must have a "*personal* stake" in the defendant's protected conduct. *Goodwin*, 457 U.S. at 383 (emphasis added). That makes sense given the "likelihood that a defendant's exercise of his rights will spur a vindictive prosecutorial response" is tied to "the burden that the defendant's conduct has placed *on the prosecution*." *LaDeau*, 734 F.3d at 569 (emphasis added). Without a burden on the decision maker, there is no basis to assume any prosecutorial action was motivated by animus. After all, the purpose of the presumption is to obviate any need to probe the prosecutor's subjective motives when it is sufficiently clear from the objective fact-pattern that there is a sufficient likelihood the prosecution was vindictive. *See Goodwin*, 457 U.S. at 373; *S. Poverty L. Ctr., Inc.*, 2026 WL 2280675, at *9.

Here, the district court did not squarely hold that McGuire objectively had a personal stake in Abrego's civil removal challenge. To the extent such a holding is implicit in the court's conclusion, it is erroneous. There is no dispute that McGuire had no interest in Abrego's civil case challenging his removal. He played no part whatsoever in that litigation. Nor was McGuire burdened or in any way affected by Abrego's success in that case. All the same is true for other prosecutors on

McGuire's prosecution team. Thus, there is no basis upon which to assume Abrego's protected conduct spurred vindictiveness in McGuire's charging decision.

### 2. To Presume Vindictiveness, The Prosecutorial Decision Maker, Not The Government As A Whole, Must Have A Stake In The Protected Conduct.

Importantly, the district court never found that McGuire was not the ultimate decision maker. No one involved in the civil immigration case made the charging decision. But based on the district court's prior order authorizing discovery, it appears the court believed that McGuire was "unknowingly" influenced by others in the Executive Branch, even if McGuire's own motives were "pure." (Mem.Op., R. 138, PageID#1525-26; *see also* Def.'s Mem. in Supp. Mtn. to Dismiss (Def.'s Mem.), R.105, PageID#1252–53 n.27 (conceding "no basis" that McGuire "has done anything" to display animus)). In the court's view, it was enough that "[t]he Government" had a "stake in retaliating against the defendant's success in the Maryland lawsuit." (Mem.Op., R.138, PageID#1525; *see also id.* at PageID#1522, 1523 (stating Abrego's removal challenge burdened "Executive Official Defendants" and relying on statements and purported "frustration" of "Executive Official Defendants")).

That is error because "motive is personal to the prosecutor who pursues" the charging decision. *United States v. Villa*, 70 F.4th 704, 713 (4th Cir. 2023). Because the "central figure" in any prosecution is the prosecutor," it is his motives "that are

central" to the analysis. *S. Poverty L. Ctr., Inc.*, 2026 WL 2280675, at *10. With McGuire's motives not directly in question, the district court looked to the Executive Branch writ large to fill in the gap. That approach fundamentally misunderstands the presumptive-vindictiveness doctrine.

Numerous courts have confirmed that "[t]he participation of different prosecuting personnel tends to negate a claim of vindictive prosecution." *United States v. Mathis*, 173 F.3d 857 (Table), 1999 WL 98465, at *2 (6th Cir. Jan. 29, 1999) (citing *Hardwick* v. *Doolittle*, 558 F.2d 292, 301 (5th Cir. 1977)). Those courts have declined to impute the allegedly retaliatory motives of other officials—even fellow prosecutors—to the actual "decisionmaker." *Maddox v. Elzie*, 238 F.3d 437, 447 (D.C. Cir. 2001). For example, evidence of animus on the part of investigators "proved nothing about the intent of the decision-makers" or "the prosecutor's state of mind." *United States v. Adams* (*Adams II*), 38 F.3d 1217, 1994 WL 589509 at *2 (6th Cir. 1994); *accord United States v. Spears*, 159 F.3d 1081, 1087 (7th Cir. 1998) ("[I]t is well settled that the actions of an investigating agency will not be imputed to a federal prosecutor."); *United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) (declining to impute any purported "political animus on the part of the IRS's civil or criminal division" onto "the persons ultimately responsible for the prosecution"). The Eighth Circuit likewise rejected presuming vindictiveness where

"a different prosecutor" added counts after a defendant impeached the government's main witness. *United States v. Chappell*, 779 F.3d 872, 880 (8th Cir. 2015); *accord United States v. Wilson*, 262 F.3d 305, 319–20 (4th Cir. 2001) (similar).

That consensus approach is consistent with the Supreme Court's caselaw on judicial vindictiveness—the doctrine from which vindictive prosecution is derived. *See Blackledge v. Perry*, 417 U.S. 21, 25–27 (1974). In the judicial context, there is no basis for a presumption of vindictiveness when a defendant successfully appeals and subsequently receives a stiffer sentence from a different judge or jury. *See id.* at 26–27. By the same token, it cannot suffice to establish that executive-branch officials other than the actual prosecutor had a purported retaliatory motive. The United States is not aware of any court applying such a "cat's paw" theory of presumptive vindictiveness.

To the contrary, imputing motive across officials in connection with entirely distinct proceedings is difficult to square with the overarching presumptive vindictiveness framework. Under the district court's approach, it is unclear why the presumption would not apply in many cases that happen to be charged following the defendant's assertion of some legal right in an entirely separate prior proceeding. This case proves the point: the court relied on its own subjective (and dubious) interpretations of public statements and routine communications up and down the

"chain of command" while disregarding McGuire's testimony, backed up by the content of such communications, that he "alone made the decision to indict Abrego." (Mem.Op., R.312, PageID#5101, 5108).[5] By imputing motives between personnel through little more than guesswork, the district court improperly "presume[d] irregularity rather than 'regularity' in this context." *Mincy*, 2025 WL 3269350, at *7 (Readler, J., concurring) (quoting *Armstrong*, 517 U.S. at 464). The district court's decision to infer subjective intent, subconscious influence, and unspoken motives over McGuire's sworn, logical explanations, significantly expanded the vindictive prosecution doctrine. *See Gauntlett v. Kelly*, 849 F.2d 213, 217 (6th Cir. 1988) (explanation needs only to amount to "an on-the-record, wholly logical, nonvindictive reason for the" challenged action) (citations altered); *see* pp. 53–54, *infra* (explaining McGuire's testimony was, in many respects, objective).

To support attributing the purported stake of others to McGuire, the district court invoked *Adams I*, where a defendant claiming vindictive prosecution was entitled to discovery based on evidence that the Equal Employment Opportunity

[5] Notably, the testimony overwhelmingly demonstrated McGuire had ultimate charging authority and was *not* influenced by others. *See supra* p. 15–16, *infra* pp. 50–51. But the district court's application of the presumption is improper even assuming some degree of influence. Otherwise, this prong of the presumption will be satisfied whenever a prosecutor operates in the usual chain of command following a defendant's litigation against the Executive Branch.

Commission had prevailed upon DOJ to bring the prosecution. *See* 870 F.2d at 1145–46; Mem.Op., R.138, PageID#1523–25. But *Adams I* concerned actual vindictiveness. *See* 870 F.2d at 1145; *Mincy*, 2025 WL 3269350, at *6 (Readler, J., concurring) (describing *Adams I* as an actual vindictiveness case).[6] This Court did not address presumptive vindictiveness at all, let alone hold that an official's stake in the defendant's assertion of rights can be presumptively imputed to the prosecutor because they are part of the same branch of government and communicate with each other. In fact, when *Adams* returned to this Court, the Court expressly focused on "the ultimate decision-makers" and rejected reliance on routine "[c]orrespondence between officials." *Adams II*, 1994 WL 589509 at *1–2. What is more, *Adams II* emphasized that (1) a presumption of vindictiveness "will be present only in a narrow range of cases" given the "hazards of broad application"; and (2) other

[6] In making his initial showing of actual vindictiveness, Adams established that similar conduct had never been prosecuted in the district. 870 F.2d at 1145–46; *see* LaFave, *supra*, § 13.5(a) (emphasizing the Supreme Court would "certainly not favor[]" a claim based on a defendant's prior exercise of a right when "the law under which he is charged is generally enforced against others"). Here, McGuire had personally prosecuted many similar cases himself. *See* Aff. Supp. Resp. Mot. Dismiss, R.121-1, PageID#1382–83 ¶¶ 1, 7, 10; Tr., R.300, PageID#4873. Adams additionally offered an affidavit of a former employee of the agency who knew the "*dramatis personae*" in the relevant agencies and had reviewed a "confidential memorandum" before swearing under oath that the prosecution was "revenge." *Adams I*, 870 F.2d at 1146. Here, there is no comparable evidence of actual vindictiveness even *after* discovery and a hearing.

circuits had "repeatedly declined" to apply the presumption to charging decisions just because the defendant had previously "sued the government." *Id.* at *1 n.1. Far from supporting the district court's strained reasoning, the *Adams* cases support reversal.

Perhaps the analysis might differ, at least under an *actual*-vindictiveness analysis, if someone with a retaliatory motive had actually "induced" McGuire to bring a charge he "would not otherwise" have brought. *Adams I*, 870 F.2d at 1146, 1148; *see also United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (suggesting a "stalking horse" theory is available to establish actual vindictiveness). But the district court did not (and could not have) made such a finding here. In applying the presumption, the court relied only on an attenuated chain between Blanche's statements and Singh's purported "oversight" in a general sense. (Mem.Op., R.312, PageID#5108–5111). Such a chain does not establish or even indicate that McGuire was "prevail[ed] upon" such that he would not have otherwise brought the charges. *Adams I*, 870 F.2d at 1146. The court's prior order's loose statements about "unknowing[]" inducement go beyond any prior application of the presumption—and would again apply in an implausibly wide range of cases. (Mem.Op., R.138, PageID#1526).

### B. Presumptive Vindictiveness Is Improper For Initial Indictments.

The district court's strained efforts to overcome McGuire's undisputed lack of personal stake in the prior proceedings demonstrate why it is never appropriate to presume vindictiveness in relation to the "government's first and only action to redress a perceived violation of federal criminal law." *United States v. Ball*, 18 F.4th 445, 455 (4th Cir. 2021). As a leading criminal procedure treatise explains, "any challenge to the *initial* decision to prosecute as a vindictive prosecution will require proof by the defendant that a vindictive motive *actually* exists." 4 Wayne R. LaFave et al., *Criminal Procedure* § 13.5(a) (second emphasis added).

Presumptive vindictiveness is reserved for cases where the circumstances demonstrate that the only likely explanation for the charges is vindictiveness. *See Goodwin*, 457 U.S. at 381 (the presumption must be "applicable in all cases" of the particular fact pattern). The "typical" scenario where the presumption might apply is thus when a "prosecutor 'ups the ante' by charging a more serious offense or more counts after [a] defendant's exercise of some procedural right relating to the initial charge," LaFave, *supra*, § 13.5(a), such as "a successful appeal," *Villa*, 70 F.4th at 712. Because additional charges at that point likely serve no purpose except punishment for exercising a right, it may be proper to presume vindictiveness to ensure defendants are not reluctant to assert rights throughout the prosecutorial process. *Blackledge*, 417 U.S. at 27–28.

By contrast, evaluating initial charging decisions entails a subjective analysis of a prosecutor's complex motivations. In the initial charging context, it is simply not possible to prove based on the factual circumstances, in "all [like] cases," that the sole likely reason why a person would be charged is vindictiveness. *Goodwin*, 457 U.S. at 381. There is no one-size-fits-all fact pattern for initial charging decisions. To the contrary, relevant factors may include "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the government's overall enforcement plan"—factors "not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Before trial, "the prosecutor may uncover additional information that suggests a basis for further prosecution, or he simply may come to realize that information possessed by the [government] has a broader significance." *Goodwin*, 457 U.S. at 381. And applying the presumption at the initial-charge stage in particular would often entail a freewheeling probe into the intentions and relationships of other government actors involved in past interactions with the defendant. That would undermine the entire rationale for a presumption rooted in objectivity.

Extending presumptive vindictiveness to initial charging decisions would thus be "a result certainly not favored by the Supreme Court," which has recognized the

"need to impose some limits on the number of criminal prosecutions in which a defendant would be entitled to put the prosecutor's motivations and intentions into issue." LaFave, *supra*, § 13.5(a); *see also Wayte*, 470 U.S. at 608 (courts are "properly hesitant to examine the decision whether to prosecute"). To ensure the doctrine retains a "stabilizing, objectively verifiable element," there is a "necessity that the defendant establish an exercise of a right by him which was both preceded by a favorable charging decision and followed by an unfavorable one." LaFave, *supra*, § 13.5(a). At least absent some definitive preceding charging decision, "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Goodwin*, 457 U.S. at 382.

Judge Readler's concurring opinion in *Mincy* ably explains why "a prosecutor's charging decisions" should not "ever trigger the presumption of vindictiveness in the pretrial context." 2025 WL 3269350, at *4 (Readler, J., concurring). Before trial, "the circumstances of the parties' engagement are entirely different." *Id.* at *5. At that stage, "prosecutors enjoy the flexibility to bring or drop charges as they assess and reassess a case, knowing that any charge must ultimately be proven beyond a reasonable doubt." *Id.* at *6. "This pretrial posture, where the prosecutor's theory has not yet 'crystallized,' is not one in which an increased

charge" (or here, a decision to charge in the first place) "reasonably suggests retaliation." *Id.* at *7 (quoting *Goodwin*, 457 U.S. at 380–81). A decision to charge "in that setting . . . is far more likely to reflect routine case assessment than punitive motive." *Id.* "This is how prosecutions ordinarily proceed, making it odd to presume irregularity rather than 'regularity' in this context." *Id.* (quoting *Armstrong*, 517 U.S. at 464). Unsurprisingly, most other circuits have held that the presumption of vindictiveness *never* applies in the pretrial setting,[7] or have never applied it themselves.[8]

To be sure, this Court has twice applied the presumption in the pretrial setting in certain narrow circumstances *not involving initial charging decisions*. *See Zakhari*, 85 F.4th at 381; *LaDeau*, 734 F.3d at 569. In both instances, prosecutors added enhanced charges "using evidence already in [their] possession" and only after defendants filed motions that threatened the government's cases. *Zakhari*, 85

[7] *See United States v. White*, 972 F.2d 16, 19 (2d Cir. 1992) ("[A] presumption of prosecutorial vindictiveness does not exist in a pretrial setting." (quotations omitted)); *Wilson*, 262 F.3d at 315 (noting "the presumption of vindictiveness . . . will rarely, if ever, be applied to prosecutors' pretrial decisions); *United States v. Williams*, 47 F.3d 658, 662 (4th Cir. 1995) (requiring "actual vindictiveness" in "the pretrial situation"); *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006) ("Th[e] presumption of vindictiveness does not apply to pretrial decisions by the prosecution.").

[8] *See Mincy*, 2025 WL 3269350, at *7 (Readler, J., concurring) ("[N]early every other circuit refuses to apply a presumption of vindictiveness in the pretrial context.").

F.4th at 382 (citing *LaDeau*, 734 F.3d at 569). Because the prosecutors brought new charges "based on the same conduct underlying [a] charge in the initial indictment," *id*. at 381 (quoting *LaDeau*, 734 F.3d at 570), there were no pertinent changed circumstances, and this Court concluded that the new charges likely served no purpose other than punishment, *LaDeau*, 734 F.3d at 568. That's not the scenario here. Even assuming a presumption could be appropriate in that specific pretrial context (which in certain respects resembles classic up-the-ante scenarios), *but see Mincy*, 2025 WL 3269350, at *4–7 (Readler, J., concurring), the United States is not aware of any court that has extended the presumption to initial charging decisions themselves, *cf.*, *Garza v. Idaho*, 586 U.S. 232, 264 (2019) (Thomas, J., dissenting) (cautioning against extending dubious due process precedents further). This Court should not be the first.

Indeed, the concerns about overapplication of presumptive vindictiveness described above apply even more in the initial charging context. "Prosecutorial charging decisions are rarely simple." *Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987). Thus, courts must be "hesitant to examine the decision whether to prosecute." *Wayte*, 470 U.S. at 608. Otherwise, no matter how well-intentioned, they will end up intruding on "[i]nvestigative and prosecutorial decision making," which "is the special province of the Executive Branch." *Trump v. United States*, 603 U.S.

593, 620 (2024) (citation modified); *accord Unites States v. Texas*, 599 U.S. 670, 679 (2023). Other courts of appeals have wisely declined to go down that fraught path. Quite the opposite. They have explained that, "[w]hen a prosecutor makes *an initial charging decision*, that decision is *presumed* to be a legitimate response to perceived criminal conduct." *Ball*, 18 F.4th at 454 (quotations omitted); *see also, e.g.*, *Spears*, 159 F.3d at 1086 ("[F]or a defendant to prove vindictiveness on the part of the government for its decision to seek an indictment, he must present objective evidence showing genuine prosecutorial vindictiveness.").

This case exemplifies why the presumption of vindictiveness does not apply to an initial charging decision. Rather than evaluating objective evidence that the government upped the ante (or took similar adverse action) in a proceeding, the district court engaged in an unbounded analysis of Executive Branch communications and the timing of the opening, closing, and reopening of overlapping, years-long, multi-agency criminal investigations. Its fact-bound reasoning was untethered from the basic purpose underlying the presumption: to avoid the need for probing the motives and mental process of government officials when the circumstances suggest vindictiveness "no matter when or where" that telltale "pattern or series appeared." *S. Poverty L. Ctr., Inc.*, 2026 WL 2280675, at *9. And the district court's logic would force prosecutors to wonder whether their

communications and investigative decisions, or even the communications and investigative decisions of others acting independently in the Executive Branch—including routine decisions to close an investigation when, *e.g.*, the suspect has seemingly been removed from the country—will limit their future prosecutorial options.

Rather than recognize the lack of objective circumstances supporting the presumption, the district court appeared to apply a weaker version of the actual vindictiveness standard. Perhaps because the presumption does not fit this stage of proceedings, the court's analysis dismissing the charges does not track the "stake" and "reasonableness" prongs at all. The court essentially reasoned that because Abrego had provided some insufficient (as even the district court recognized) evidence of *actual* vindictiveness based on loose characterizations of public and Executive Branch communications, the *presumption* should apply to compensate for that weakness and shift the burden to the government to disprove the court's suspicions. That is not how the narrow doctrine works.

Rejecting the district court's approach does not leave criminal defendants like Abrego without recourse to challenge prosecutorial motives. *See Mincy*, 2025 WL 3269350, at *6 (Readler, J., concurring) (identifying "other doctrines" that might "provide relief"). But a defendant in these circumstances must show *actual*

vindictiveness. *See* LaFave, *supra* § 13.5(a).[9] Because even the district court held that Abrego failed to do so, it was legal error to dismiss the indictment. (*See* Mem.Op., R. 312, PageID#5095; Mem.Op., R.138, PageID#1520–21). Although this Court can reverse on that basis alone, the district court's additional errors in applying the presumption only reinforce the pitfalls of flyspecking prosecutors' initial charging decisions.

**C. The Decision To Indict Abrego Was Objectively Reasonable.**

Even if a prosecutor had a stake in the defendant's exercise of a legal right, the defendant must still demonstrate that the prosecutorial action was unreasonable. *See Zakhari*, 85 F.4th at 383. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978). Courts typically find conduct unreasonable when the objective circumstances indicate a strong likelihood that the charges served no purpose other than punishment for exercising a protected right. *See LaDeau*, 734 F.3d at 568. Under this standard, the government need only show

[9] A defendant could also raise a separate claim, such as a selective prosecution claim under the Equal Protection Clause. The district court did not reach Abrego's (meritless) selective prosecution claim.

that the "conduct is attributable to a legitimate reason." *Esposito*, 968 F.2d at 305. This includes when a prosecutor "bring[s] new charges as a result of changed or altered circumstances which properly bear on prosecutorial discretion." *Id.* at 305–06 (quoting *United States v. Griffin*, 617 F.2d 1342, 1348 (9th Cir. 1980)); *accord LaDeau*, 734 F.3d at 568 ("unexpected changes or an incomplete initial grasp of the pertinent issues or facts").

Here, there is no dispute that the government had probable cause to charge Abrego. "[T]he undisputed facts" and "evidence" supporting the charges, as well as the grand jury's finding that "the evidence supported a finding of probable cause," "buttress the presumption of regularity" applicable to the charging decision. *Wilson*, 262 F.3d at 316.[10]

The district court's order granting the motion to dismiss did not squarely explain why the government's charging decision was nevertheless purportedly

[10] The district court stated that the evidence against Abrego was irrelevant because a "defendant's guilt is not at issue on a vindictive prosecution motion." (Mem.Op., R.312, PageID#5111). But vindictive prosecution theories are normally about the motives of the prosecutor. *See supra* pp. 27–28. For civil retaliatory prosecution claims focused on the motives of *another* official who purportedly "influenced the prosecutorial decision," the Supreme Court requires an "absence of probable cause." *Hartman*, 547 U.S. at 262–63. That is needed to establish a "causal connection" given the "factual difficulty of divining the influence" of another official "upon the prosecutor's mind" and the "longstanding presumption of regularity." *Id.* at 263. There is no basis for a different rule here.

unreasonable. But the court appeared to assume that indicting a criminal alien in light of his pending return to the country (along with additional strong evidence the prosecutor discovered) is unreasonable if that return resulted from a lawsuit. That assumption is patently erroneous.

**1. The Charging Decision Was Supported By Legitimate Prosecutorial Concerns Surrounding The Defendant's Return To The Country.**

Abrego's pending return was an objectively critical development that properly bore on prosecutorial discretion. By May 2025, the government had been ordered to facilitate that return. The government believed that Abrego had committed human smuggling, that he was "a member of the gang MS-13, a designated foreign terrorist organization, and that his return to the United States would pose a threat to the public." *Abrego Garcia*, 145 S. Ct. at 1018. Although his deportation had removed that threat and supported closing the criminal investigation, the deportation now had to be undone, at least temporarily. So the United States had a clear legitimate interest in prosecuting Abrego upon his return. During the early 20th century, no one would have presumed a vindictive motive if the government had attempted to remove suspected members of the Mafia to Italy but prosecuted any who defeated removal.

Moreover, the government had a strong interest in confirming that Abrego was a threat to public safety. The court in the civil immigration case had been

skeptical of the government's claims that Abrego was a member of MS-13 who had engaged in criminal activity. *See supra* pp. 6–7. And in verifying its claims, prosecutors were not required to turn a blind eye toward additional evidence the government had obtained just because the government secured that evidence following public and judicial scrutiny arising from Abrego's civil challenge to his deportation. After all, "the mere filing of a lawsuit against an agency of the federal government does not give anyone a license to break the law and insist that any ensuing prosecution be quashed as retaliatory." *Adams I*, 870 F.2d at 1145.

**2. The Court Conflated Factual Causation With Punishment.**

The entire basis for the district court's ruling was the premise that prosecutors "would not have indicted" Abrego "but for Abrego's lawsuit." (Mem.Op., R.312, PageID#5095). That misses the point. As the district court recognized, the question is whether the prosecution "would not have been initiated but for *vindictiveness*" in relation to the exercise of a right, not but for a lawsuit itself. (*Id.*, PageID#5094 (quoting *Bragan*, 249 F.3d at 481)). In other words, the charges must be *punishment for* the exercise of a protected right, not merely *follow* the exercise of the right. *See Zakhari*, 85 F.4th at 385 (Kethledge, J., concurring in part and dissenting in part). The fact that the government brings charges as a causal *result* of the defendant's successful assertion of his rights does not mean the government is charging him to punish or retaliate against him for *asserting* his rights. *See S. Poverty L. Ctr.,*

*Inc.*, 2026 WL 2280675, at *10 n. 9 (distinguishing between "prosecutions expressly predicated upon, rather than merely subsequent to, protected activity"). Of course, Abrego's lawsuit had a causal relationship with the prosecution in a general sense. The lawsuit resulted in Abrego's pending return, necessitating his prosecution to deter crime and protect the public by alternative means. But there's nothing vindictive about that change of circumstances, and certainly no basis to conclude that the fact-pattern objectively supports an inference of improper punishment.

Many cases illustrate this distinction. When the government had a passive enforcement policy of prosecuting only those who reported themselves as violating the law, including via speech protected by the First Amendment, that did not mean the government prosecuted a defendant "*because of* his protest activities" in the relevant sense. *Wayte*, 470 U.S. at 609. Although the government became aware of a criminal violation, and thus prosecuted it, because of a defendant's protected speech, that did not mean the government was punishing the defendant *for* that speech. *See id.*

Similarly, in *Esposito*, a jury acquitted the defendant on an overarching RICO charge but did not address whether the defendant had committed specific predicate crimes. 968 F.2d at 302. Prosecutors then charged the defendant with cocaine distribution. *Id.* There would have been no need to do so had the

defendant been convicted initially. But the Third Circuit held that no presumption of vindictiveness applied. *Id.* at 303–05. Although the government's conduct was in some sense "attributable to its disappointment with the results of the first trial," the government "did not react because [the defendant] invoked or exercised a constitutional right; he was simply acquitted by a jury." *Id.* at 305. "The benefit [the defendant] received from his first acquittal [was] intact," and "the alleged vindictive action was too far removed from the right he exercised for a presumption of vindictiveness to arise." *Id.* Because the "prosecutor's conduct [was] equally attributable to legitimate reasons," the defendant needed to "show actual vindictiveness." *Id.* at 306–07. To hold otherwise would make "acquittal a waiver of criminal liability" beyond the normal protection from double-jeopardy. *Id.* at 306.

Similar distinctions apply in the civil context. In *Murray v. UBS Sec., LLC*, the Supreme Court addressed a hypothetical "where an employee's whistleblowing causes a client to end their relationship with the company, leaving the whistleblower without any work and ultimately leading to the elimination of the whistleblower's position." 601 U.S. 23, 38 (2024). In that circumstance, the employer is not liable just because the employee lost their job as a result of whistleblowing. *Id.* Instead, the employer would be liable only if it fired the

employee *for* engaging in the protected activity of whistleblowing. If the employer "would have taken the same action if it had learned of the contents of the employee's protected disclosure through other means," there is no retaliatory motive and no violation of the statute. *Id.* at 39.

This case is similar. Although the government would have had less practical reason to prosecute Abrego had he remained in El Salvador, that does not mean the government prosecuted Abrego *as punishment for* the civil lawsuit challenging his removal. Abrego's criminal prosecution was much more attenuated from the civil immigration context than the prior trial in *Esposito*. And as in *Murray*, the government's reasons for prosecution would still hold even if the government had learned of the flawed removal and returned Abrego to the country on its own accord rather than as a result of litigation. Applying a presumption here would seemingly make a successful removal challenge a presumptive waiver of criminal liability—even though prosecutors may often have good policy and resource reasons to defer criminal prosecutions until immigration proceedings play out.

For all these reasons, one of the district court's primary rationales—that "[t]he timing of HSI's closing and subsequent reopening of the investigation into Abrego's November 2022 traffic stop is telling and forceful"—gets it backwards. (Mem.Op., R.312, PageID#5095). The timing strongly reinforces the government's

legitimate prosecutorial purpose. HSI closed the investigation shortly after Abrego was deported, which objectively suggests the government believed removal was adequate to address Abrego's criminal conduct. (Ex. B DHS April 2025 ROI, R.153, PageID#1610 (citing Abrego's immigration arrest and removal from the country and thus noting "all goals for this case" were "accomplished" and "no further investigative efforts will be" made)). And after Abrego filed his civil removal challenge, HSI did not reopen the investigation until after courts had ordered Abrego's return. That strongly suggests the government was concerned about Abrego's impending presence in the country, not the mere filing of a civil challenge that precipitated it. The district court never grappled with the government's evident and objectively legitimate reasons to prosecute Abrego.

Instead, the court focused on the fact that the government did not charge in 2022, as if the decision to charge in 2025 could be explained only by vindictiveness. (Mem.Op., R.138, PageID#1526). As an initial matter, courts have no authority to second-guess a delay in the timing of charging decisions beyond applying recognized statutory and constitutional constraints. Regardless, "presidential administrations" change, and with them so do "enforcement priorities." *S. Poverty L. Ctr., Inc.*, 2026 WL 2280675, at *9. "[T]here is nothing improper about a President having policy preferences and directing the Executive Branch"

accordingly. *QueerDoc, PLLC v. DOJ*, No. 25-7384, 2026 WL 2359440, at *12 (9th Cir. Aug. 14, 2026). Immigration enforcement is a priority for the current administration. Prosecutors may decide that a dormant case deserves a fresh look, particularly when safety concerns are brought to the government's attention by the public and the media. That kind of shift is routine in federal law enforcement, not a signal of retaliatory motive. That is especially true when, as here, the prosecutor in question wasn't aware of the conduct until 2025. (Tr., R. 300, PageID#4879). It was therefore improper to presume vindictiveness based on timing that "would not, standing alone necessarily mean that a reasonable likelihood of vindictiveness exists." *S. Poverty L. Ctr., Inc.*, 2026 WL 2280675, at *9 (quotations omitted).

Even if the investigative timeline were suspicious, it would not be a basis to question the prosecutor's motives. McGuire was not involved in the closing and reopening of the HSI investigation. Once he was involved, he moved quickly to gather evidence and determine whether charges were appropriate. "[T]he construct of collective knowledge is out of place in a search for vindictiveness, which is a motive personal to the prosecutor." *Villa*, 70 F.4th at 713.

**3. Blanche's Statements Do Not Suggest Animus.**

The government's legitimate bases to prosecute Abrego are enough to reject Abrego's vindictiveness theory. But the district court's failure to understand the difference between prosecution resulting from prior litigation in a general sense and

a specific purpose to punish *for* bringing that litigation also led the court to misconstrue then-Deputy Attorney General Blanche's statements—to the extent such statements could ever be relevant.

As with the timeline, Blanche's statements highlight the prosecution's legitimate purposes. With respect to Abrego's pending return to the country, Blanche stated that the Department of Justice "ha[s] a responsibility to protect the American people and to keep our country safe. And so he was indicted." *Supra* p. 12. And with respect to confirming Abrego's threat to public safety, Blanche said "a judge in Maryland and many members of Congress . . . said oh no, he's just a family man," and "there's not any evidence that he's a member of MS-13." *Id.* "And so we said ok, we'll look into it." *Id.*

All of that is consistent with the proper prosecutorial purposes outlined above. Blanche's references to the result of prior litigation and judicial statements made in that litigation do not reflect a vindictive motive. *See United States v. Campbell*, 410 F.3d 456, 462 (8th Cir. 2005) ("A presumption does not arise just because action detrimental to the defendant was taken after the exercise of the defendant's legal rights."). On its face, Blanche's rationale reflected a "normal assessment of the societal interest in punishment," not an "improper penalty." *Goodwin*, 457 U.S. at 380 n. 11. At a minimum, nothing in his interview supports an inference that the

United States pursued charges "solely" to retaliate against Abrego for his civil suit. *Id.* The district court's contrary reasoning—which did not even address the full quotation—is illogical and clearly erroneous.[11]

As noted, even if Blanche had expressed animus, McGuire's independent decision to prosecute would break any causal chain to Blanche's statements—and thus undermine any argument that the *prosecutor*'s actions were unreasonable based on Blanche's statements. It is undisputed that McGuire initiated his own investigation based on local news reporting before he heard from anyone in the Department of Justice. (Tr., R. 300, PageID#4824, 4862–63); *see United States v. Sanders*, 211 F.3d 711, 719 (2d Cir. 2000) ("The fact that an aggressive investigation commenced immediately following publication of the newspaper article provides no evidence of such vindictiveness" because it "indicated a potential" crime). Given the district court's acknowledgment that Blanche's statements addressed only "the investigation directly, not the indictment," that alone defeats the district court's attenuated theory of prosecutorial "taint." (Mem.Op., R. 312, PageID#5104, 5109). Regardless, Blanche's statements and Singh's standard communications cannot

[11] The district court characterized Blanche as "reveal[ing] that the government started 'investigating' Abrego after 'a judge in Maryland . . . questioned that decision.'" (Mem.Op., R.312, PageID#5092). Instead of reviewing Blanche's remarks in their full context, the district court recycled Abrego's cherry-picked summary of Blanche's statements.

negate McGuire's prosecutorial discretion. To hold otherwise would "threaten[] to chill law enforcement" from speaking about matters of public interest and engaging in basic internal coordination. *Cf. Wayte*, 470 U.S. at 607.

## II. Even If Presuming Vindictiveness Were Proper, The District Court Erred In Holding The Prosecution Insufficiently Rebutted It.

The government rebutted any presumption by providing "objective, on-the-record explanations" for prosecution. *LaDeau*, 734 F.3d at 566 (quotations omitted). For the same reasons just discussed, the government's self-evident purposes rebutted the presumption. Even beyond those reasons, the government provided objective evidence of McGuire's independent decision making and explained the "discovery of previously unknown evidence." *Bragan*, 249 F.3d at 482. The district court erred in rejecting those additional uncontroverted explanations.

### A. The Prosecution Rebutted Any Presumption With Objective, Independent Evidence.

The United States provided objective evidence that the charges were brought for legitimate reasons by a decision maker who incontestably harbored no animus. The district court relied on speculation rather than objective proof, second-guessing a prosecutor's actions based on its *own* subjective reasoning.

First, the presumption was rebutted because the charging decision was made by an official independent from the one alleged to harbor animus. As in *Adams II*, at the hearing, the United States provided objective evidence that McGuire

had "total autonomy" in deciding to charge. *Bragan*, 249 F.3d at 484; *see* Tr., R.300, PageID#4858 (Q: "Who made the decision to seek an indictment of Mr. Abrego?" A: "I did."); PageID#4903 ("If I believed Mr. Abrego didn't commit a crime … I would have said that to the DAG's office"). He was not pressured. (*Id*., PageID#4858–59 (no one directed, asked, or insinuated he should charge); PageID#4874–75 (Q: "[I]f someone had directed you to seek an indictment in this case, based only on the body camera video alone, would you have done that?" A: "No. We wouldn't have had enough evidence."); PageID#4884 ("[I]t didn't matter who else wanted it or didn't want it, it was going to come back to me"); PageID#4905 ("I also am not going to do something that I think is wrong to keep my job.")). He conducted an "independent investigation," *Bragan*, 249 F.3d at 484, with appropriate coordination with DOJ officials consistent with the Justice Manual.

The district court wrongly disregarded this testimony as "subjective." (Mem.Op., R. 312, PageID#5108.). But much of the testimony was about the objective circumstances of the prosecution and Department communications—not what was in McGuire's head. McGuire did not merely provide unsworn assurance that he "intended all along" to bring the charge. *LaDeau*, 734 F.3d at 565. The objective, undisputed fact that "no one outside of Nashville provided any input

whatsoever to the charging documents," (Tr., R.300, PageID#4983), is alone sufficient to rebut any presumption.[12]

Second, the objective evidence showed that McGuire's investigation started independently when Agent Saoud saw a news report and called McGuire, not because anyone steered her or McGuire. *See supra* p. 14. Again, this on-the-record evidence concerns timing and communication, not subjective assertions about what McGuire "intended." *See LaDeau*, 734 F.3d at 565. And again, because Blanche's statements addressed only the investigation (Mem.Op., R.312, PageID#5099), this objective evidence defeats the court's taint theory and shows that vindictiveness was not a "but for" cause of Abrego's charge, *Bragan*, 249 F.3d at 481, nor was the charge filed "solely" to punish, *Goodwin*, 457 U.S. at 380 n.11; *see also Adams I*, 38 F.3d at 1217 (defendant offered no "reason to disbelieve the government's account of the events leading to [his] indictment and prosecution"). By contrast, nothing in the record provides a basis to doubt why McGuire charged when he did.

[12] The district court's emphasis on Singh's vague reference to getting "clearance" on something before McGuire proceeded with the indictment, (Mem.Op., R.312, PageID#5101), does not change the analysis. A local prosecutor getting clearance from DOJ leadership to proceed with a decision the local prosecutor has made is not remotely comparable to DOJ leadership instructing the prosecutor to do something he would not otherwise do. Regardless, McGuire testified there was nothing to clear and he was merely making sure his partners in Washington were "ready for this to happen" in a high-profile matter. (Tr., R.300, PageID#4967–68).

The government's rebuttal is especially forceful given that the district court's rationale for applying the presumption appeared to rest on its *own* subjective assumptions about whether McGuire was a truly independent decision maker given his interactions with Singh. The district court believed that McGuire was a "gifted" prosecutor who had been duped by being "brought into a tainted investigation . . . to obtain a tainted indictment" despite zero objective evidence (documentary or otherwise) to that effect. (Mem.Op., R.312, PageID#5122). The district court relied instead on assumptions about intra-departmental communications that never showed McGuire was tricked (and were utterly unsurprising in a high-profile case such as this). That is antithetical to the requirement that only "clear evidence" can overcome the presumption of regularity. *Armstrong*, 517 U.S. at 564. And it is manifestly unfair for the district court to rely on its own subjective interpretations while disregarding McGuire's contrary objective testimony.

The district court similarly injected its subjective interpretations into the case by elevating the dissenting views of the former Criminal Chief of McGuire's office over the person in charge. *See* Mem.Op., R.138, PageID#1521 n.1; Mem.Op., R.312, PageID#5111 (faulting McGuire for failing to "reconcile" his prosecutorial assessment with the former chief). But one subordinate's opinion cannot make a prosecutorial decision unreasonable, let alone subject to judicial override. In any

event, McGuire explained that he considered his colleague's input before deciding to proceed because Abrego clearly committed a crime. *See* Tr., R.300, PageID#4902–03. That is more than needed to be said about "intra-office conversations and memoranda" that ought to have been protected "by multiple privileges." *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005). The district court never explained (1) why the evaluation of a U.S. Attorney should take a back seat to a subordinate, or (2) how the district court was institutionally capable of litigating an internal Executive Branch dispute. 28 U.S.C. § 516 (reserving the "conduct of litigation" when the United States is a party to the Attorney General and Department of Justice).

### B. The District Court Erred In Excluding New Evidence As Irrelevant To The Charging Decision.

The prosecution relied on a wealth of new evidence that emerged after Abrego had been ordered to return. (Mem.Op., R.312, PageID#5107). This included testimony from multiple witnesses, including a young woman with no motive to lie, and license plate reader data making clear that Abrego had lied to officers during the stop because his vehicle had been in Texas, not St. Louis. *See supra* pp. 6, 10. When, as here, the government can show that "charges were not brought earlier because they are based on new evidence, it will sufficiently rebut a showing of vindictiveness." *Suarez*, 263 F.3d at 480.

The district court ignored that principle for no good reason. All the court could muster was its view that the evidence could have been discovered earlier "with due diligence." (Mem.Op., R.312, PageID#5103). But there is no due process problem with "investigative delay," at least absent intentional tactical conduct that prejudices a defendant (not at issue here). *United States v. Lovasco*, 431 U.S. 783, 796 (1977); *accord United States v. Marion*, 404 U.S. 307, 324 (1971). "[V]arious prosecutorial decisions such as the assignment of manpower and priorities among investigations of known offenses may [properly] affect the length of such delays." *Lovasco,* 431 U.S. at 797 n.19 (internal quotation marks omitted). The balancing of such policy considerations is notoriously "ill-suited to judicial review." *Wayte*, 470 U.S. at 607.

The district court's reliance on Federal Rule of Criminal Procedure 33(b) to support its diligence requirement is inexplicable. The Rule 33 standard for defendants to obtain new trials based on newly discovered evidence is plainly inapplicable to the prosecution. *See* Fed. R. Crim. P. 33(a). Applying the rule in this context would conflict with the Supreme Court's due process precedents regarding prosecutorial delay, *see Lovasco*, 431 U.S. at 796; *Marion*, 404 U.S. at 324, while undermining congressionally determined statutes of limitations. It hardly makes sense for a court to assess prosecutorial diligence in a case based on delay, without considering the individual prosecutor's knowledge and the government's complex

mix of priorities and resource constraints. Investigations are fluid, and the government may "come to realize that information [it] already possess[es] has a broader significance." *Villa*, 70 F.4th at 713. *Id.* (quotations omitted).

For all these reasons, the United States is not aware of any court applying Rule 33 principles when evaluating a vindictive prosecution claim. The district court's refusal to even consider the government's newly discovered evidence, which provided a standalone explanation for the charges, was another reversible error.

* * *

Each of the district court's errors independently compels reversal. But the problematic implications of those cumulative errors cannot be overstated. "Prosecutorial charging decisions are rarely simple. In addition to assessing the strength and importance of a case, prosecutors also must consider other tangible and intangible factors, such as government enforcement priorities" and "how best to allocate the scarce resources of a criminal justice system." *Town of Newton*, 480 U.S. at 396. Yet the district court's approach would, in multiple ways, violate the cardinal principle that "federal judges should not engage in Monday-morning quarterbacking" of prosecutorial decisions. *S. Poverty L. Ctr., Inc.*, 2026 WL 2280675, at *7. In a case where the government clearly had probable cause and multiple legitimate bases to prosecute, the court relied on dubious assumptions about

public statements, internal communications, timing, diligence, and the susceptibility of a professional prosecutor to subconscious influence—all in the context of an initial charging decision where the range of prosecutorial considerations is most complex and least suited to judicial second-guessing. Adopting this approach will lead to a flood of vindictive prosecution motions in high profile cases. And accepting it only in this case would be equally improper. "[L]aw remains law despite the political controversies of the day." *Margolin v. NAIJ*, 146 S. Ct. 1285, 1290 (2026) (Thomas, J., concurring).

## CONCLUSION

This Court should reverse the district court's order dismissing the indictment.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRADEN H. BOUCEK
s/ B.H. Boucek
United States Attorney for the
Middle District of Tennessee
719 Church Street, Suite 3300
Nashville, Tennessee 37203
(615) 736-5151

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

ANNA L. EDWARDS
Counsel to the Associate Attorney General

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief contains 12,963 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitations on length of a brief set forth at Rule 32(a)(7)(B)(I) of the Federal Rules of Appellate Procedure.

s/ B.H. Boucek
BRADEN H. BOUCEK
Counsel for the United States
Date: August 17, 2026

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this brief was filed on August 17, 2026, which emailed everyone requiring notice.

s/ B.H. Boucek
BRADEN H. BOUCEK
Counsel for the United States
Date: August 17, 2026

## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

Under 6 Cir. R. 28(b) and 6 Cir. R. 30(b), the United States hereby designates the following relevant district court documents in the electronic record:

| Record Entry | Description | PageID# |
|---|---|---|
| 3 | Indictment | 3–13 |
| 61 | Transcript of Detention Hearing (June 13, 2025) | 558–799 |
| 104 | Defendant's Motion to Dismiss Indictment | 1227–1229 |
| 105 | Defendant's Memorandum in Support of Motion to Dismiss Indictment | 1230–1268 |
| 121-1 | Affidavit in Support of Government's Response to Motion to Dismiss | 1382–1387 |
| 138 | Memorandum Opinion | 1514–1529 |
| 140 | Order | 1532 |
| 153 | DHS April 2025 ROI | 1608–1610 |
| 178-1 | Supplemental Affidavit Supporting Government's Response | 1817 |
| 300 | Transcript of Evidentiary Hearing (Feb. 26, 2026) | 4813–4995 |
| 312 | Memorandum Opinion | 5082–5113 |
| 313 | Order Granting Defendant's Motion to Dismiss Indictment | 5114 |
| 314 | Notice of Appeal | 5118 |
| 315-1 | Gov't Ex. 1, Evidentiary Hearing (Feb. 26, 2026) (various emails) | 5120–5133 |
| 315-2 | Def's Ex. 17, Evidentiary Hearing (Feb. 26, 2026) (HSI-Baltimore ROI on Interview) | 5134–5138 |
| 315-3 | Def's Ex. 19, Evidentiary Hearing (Feb. 26, 2026) (ROI First Interview of CC-1) | 5139–5140 |
| 315-4 | Def's Ex. 30, Evidentiary Hearing (Feb. 26, 2026) (HSI Baltimore Report on Reopening of Investigation) | 5141–5145 |