**26–5555**

IN THE

# United States Court of Appeals

FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

KILMAR ARMANDO ABREGO GARCIA,

*Defendant-Appellee.*

*On Appeal from the United States District Court*
*for the Middle District of Tennessee, Nashville Division*
*Waverly D. Crenshaw, Jr., U.S. District Judge, No. 3:25-cr-00115*

## BRIEF FOR DEFENDANT-APPELLEE

Jeffrey L. Fisher
HECKER FINK LLP
1019 East Fourth Place, 3rd Floor
Los Angeles, California 90013
212-763-0883

Rascoe S. Dean
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
615-742-4200

Sean Hecker
Jenna M. Dabbs
David Patton
Derek Wikstrom
Jeffrey Then
Thea Raymond-Sidel
Nicole Ng
Alexandra Kersley
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
212-763-0883

*Attorneys for Defendant-Appellee*

PHP (212) 719-0990 appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iv

STATEMENT REGARDING ORAL ARGUMENT .......... viii

STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE ISSUES .......... 2

INTRODUCTION .......... 3

STATEMENT OF THE CASE .......... 5

I. Factual Background .......... 5

A. Mr. Abrego Prompts the Government's Ire By Successfully Challenging His Unlawful Deportation .......... 5

B. While Feigning Inability to Return Mr. Abrego, the Government Reopens an Old Investigation into Him .......... 7

C. Officials in Main Justice Prevail Upon Acting U.S. Attorney Robert McGuire to Charge Mr. Abrego .......... 9

PROCEEDINGS BELOW .......... 16

A. Mr. Abrego's Motion to Dismiss and Discovery .......... 16

B. The District Court's Dismissal .......... 18

SUMMARY OF THE ARGUMENT .......... 19

STANDARD OF REVIEW .......... 20

ARGUMENT .......... 21

I. The District Court Did Not Abuse Its Discretion By Applying a Presumption of Vindictiveness to This Case ....23

A. The Government's Argument that a Presumption of Vindictiveness Cannot Apply to an Initial Indictment Is Forfeited and Meritless ....23

1. The Government Forfeited This Argument....24

2. Binding Precedent Forecloses the Government's Argument....26

B. The District Court Permissibly Looked to Individuals Beyond the Local U.S. Attorney to Discern the Government's Motives ....30

C. The Government's Argument That Its Decision to Charge Mr. Abrego Was Objectively Reasonable Is Forfeited and Meritless ....34

1. The Government Has Forfeited This Argument ....34

2. At Any Rate, the Record Contradicts This Argument....39

II. The District Court Did Not Abuse Its Discretion in Holding That the Government Failed to Rebut the Presumption....41

A. The District Court's Finding That McGuire's Testimony Was Not Credible Was Not Clearly Erroneous....42

B. The District Court's Finding That the Government's "New" Evidence Did Not Motivate the Charging Decision Was Not Clearly Erroneous....45

III. If the District Court Erred, the Court Should Remand for Further Proceedings ....47

CONCLUSION ........................................................................................................48

CERTIFICATE OF COMPLIANCE .....................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrego Garcia v. Noem*,
777 F. Supp. 3d 501 (D. Md. 2025) ........................................ 5, 6

*Abrego Garcia v. Noem*,
No. 25 Civ. 951, 2025 WL 1024654 (D. Md. Apr. 4, 2025) ........................................ 6

*Abrego Garcia v. Noem*,
No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) ........................................ 6

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) ........................................ 21, 45

*Bordenkircher v. Hayes*,
434 U.S. 357 (1978) ........................................ 21

*Bragan v. Poindexter*,
249 F.3d 476 (6th Cir. 2001) ........................................ 28, 41

*Castro v. United States*,
540 U.S. 375 (2003) ........................................ 24

*Chaffin v. Stynchcombe*,
412 U.S. 17 (1973) ........................................ 33

*Duffy v. Sarault*,
892 F.2d 139 (1st Cir. 1989) ........................................ 42

*Flowers v. Mississippi*,
588 U.S. 284 (2019) ........................................ 35, 44

*Greer v. United States*,
938 F.3d 766 (6th Cir. 2019) ........................................ 24, 25

*Harrison v. Monumental Life Ins. Co.*,
333 F.3d 717 (6th Cir. 2003) ........................................ 21, 44

*Henderson v. Shinseki*,
562 U.S. 428 (2011)....................36

*Hunter v. United States*,
160 F.3d 1109 (6th Cir. 1998)....................24

*Layman v. Alloway Stamping & Mach. Co.*,
98 F. App'x 369 (6th Cir. 2004)....................25

*Marshall v. Rawlings Co. LLC*,
854 F.3d 368 (6th Cir. 2017)....................32

*Miller-El v. Dretke*,
545 U.S. 231 (2005)....................42

*Noem v. Abrego Garcia*,
145 S. Ct. 1017 (2025)....................3, 7

*North Carolina v. Pearce*,
395 U.S. 711 (1969)....................30

*Padilla v. Kentucky*,
599 U.S. 356 (2010)....................30

*Shea v. Kerry*,
796 F.3d 42 (D.C. Cir. 2015)....................36

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011)....................32

*Torres v. MacLaren*,
798 F. App'x 916 (6th Cir. 2020)....................21, 35

*United States v. Adams*,
870 F.2d 1140 (6th Cir. 1989)....................*passim*

*United States v. Adams*,
No. 93-5682, 1994 WL 589509 (6th Cir. 1994)....................28

*United States v. Andrews*,
633 F.2d 449 (6th Cir. 1980)....................*passim*

*United States v. Barner*,
441 F.3d 1310 (11th Cir. 2006) ....................27

*United States v. Brasher*,
962 F.3d 254 (7th Cir. 2020) ....................36, 41

*United States v. Carey*,
816 F. Supp. 3d 129 (D.D.C. 2026)....................29

*United States v. Goodwin*,
457 U.S. 368 (1982)....................26, 27, 29, 33

*United States v. Howell*,
17 F.4th 673 (6th Cir. 2021) ....................22

*United States v. Koh*,
199 F.3d 632 (2d Cir. 1999) ....................31

*United States v. LaDeau*,
734 F.3d 561 (6th Cir. 2013) ....................*passim*

*United States v. Meyer*,
810 F.2d 1242 (D.C. Cir. 1987)....................26

*United States v. Miller*,
948 F.2d 631 (10th Cir. 1991) ....................28, 29

*United States v. Mincy*,
No. 24-4019, 2025 WL 3269350 (6th Cir. Nov. 24, 2025)....................24, 30

*United States v. Monsoor*,
77 F.3d 1031 (7th Cir. 1996) ....................32

*United States v. Noble*,
762 F.3d 509 (6th Cir. 2014) ....................24, 25

*United States v. Olano*,
507 U.S. 725 (1993)....................25

*United States v. Raymer*,
941 F.2d 1031 (10th Cir. 1991) ....................27

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........................................ 24

*United States v. Southern Poverty Law Center, Inc.*,
___ F. Supp. 3d ___, 2026 WL 2280675 (M.D. Ala. 2026) ........................................ 29, 32

*United States v. Watkins*,
107 F.4th 607 (7th Cir. 2024) ........................................ 36, 38

*United States v. Zakhari*,
85 F.4th 367 (6th Cir. 2023) ........................................ *passim*

*Wyatt v. Nissan N. Am., Inc.*,
999 F.3d 400 (6th Cir. 2021) ........................................ 32

*Zamora v. City of Houston*,
798 F.3d 326 (5th Cir. 2015) ........................................ 32

**Statutes**

18 U.S.C. § 3231 ........................................ 1

18 U.S.C. § 3731 ........................................ 1

**Rules**

Fed. R. App. P. 4(b)(1)(B) ........................................ 1

Federal Rule of Criminal Procedure 52(b) ........................................ 25

**Other Authorities**

*Attorney General Bondi News Conference*, C-SPAN (June 6, 2025),
https://www.c-span.org/program/news-conference/attorney-general-bondi-news-conference/660932 ........................................ 15

*Kilmar Abrego Garcia Was Indicted on 'Very Serious' Charges, US Deputy Attorney General Says*, Fox News (June 6, 2025),
https://www.foxnews.com/video/6373969491112 ........................................ 41

*Remarks: Donald Trump Holds a Bilateral Meeting with Nayib Bukele of El Salvador*, Roll Call (Apr. 14, 2025),
https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-bilat-nayib-bukele-el-salvador-april-14-2025 ........................................ 8

## STATEMENT REGARDING ORAL ARGUMENT

This case involves a straightforward application of this Circuit's vindictive prosecution doctrine and appellate forfeiture principles. We recognize, however, that the government is asking this Court to depart from its precedent in various ways. As a result, Mr. Abrego respectfully requests oral argument pursuant to Circuit Rule 34(a)(1).

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3731. The Government filed a timely notice of appeal pursuant to 18 U.S.C. § 3731 and Fed. R. App. P. 4(b)(1)(B).

## STATEMENT OF THE ISSUES

1. Did the District Court abuse its discretion in applying a presumption of vindictiveness where: (a) this Court has held that such a presumption can apply to an initial charging decision, and the government forfeited any argument to the contrary; (b) this Court has held that the "improper motives" of a U.S. Attorney's supervisors are relevant to the vindictiveness inquiry, and the record shows that individuals in Main Justice pressured the local U.S. Attorney's office to indict; and (c) the government's argument for the reasonableness of its decision to charge was not raised below, and is inconsistent with the facts in the record?

2. Did the District Court abuse its discretion in holding that the government failed to rebut a presumption of vindictiveness, where the District Court found that the government failed to proffer credible "objective, on-the-record explanations" supporting its charging decision?

## INTRODUCTION

In March 2025, the Department of Homeland Security ("DHS") illegally deported Kilmar Abrego Garcia to El Salvador, where he was imprisoned at the notorious Terrorism Confinement Center ("CECOT") and tortured. Mr. Abrego sued in federal court in Maryland for his release. And he won repeatedly, culminating in the Supreme Court's order that the government "facilitate" his "release from custody in El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

In response to Mr. Abrego's litigation, the government reopened an investigation into Mr. Abrego it had previously closed, and soon thereafter, charged him criminally. The criminal indictment—which was filed by the then-Acting United States Attorney for the Middle District of Tennessee, but which discovery showed was directed by the Office of the Deputy Attorney General ("ODAG")—is based on a three-year-old traffic stop after which Mr. Abrego was released without so much as a citation. As then-Deputy Attorney General Todd Blanche explained, the government undertook these prosecutorial efforts only after "a judge in Maryland . . . questioned" the government's decision to deport Mr. Abrego, found that it "had no right to deport him," and "accus[ed] [the government] of doing something wrong." Mem. Op., R. 138, #1519.[1]

---

[1] This brief cites documents from the district court record using the form "[Document Description], R.__, # [PageID]." "Gov't Br." refers to the government's brief on

The government characterizes all of this as business as usual. But the District Court correctly recognized that "[t]he Fifth Amendment forbids the government from punishing Defendants for exercising their constitutional and statutory rights," and that includes seeking to "punish the defendant for standing on his legal rights." Mem. Op., R. 138, #1515 (first quoting *United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023); and then quoting *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013)). After holding an evidentiary hearing, considering documentary evidence, and making credibility determinations, the District Court also concluded that, "absent [Mr. Abrego's] successful lawsuit challenging his removal to El Salvador, the Government would not have brought this prosecution." Mem. Op., R. 312, #5113. It therefore dismissed the indictment. *Id.* The District Court made clear it did "not reach its conclusion lightly." *Id.* But controlling law and the Constitution left no other way to "cure the retaliatory taint." *Id.*

The government now appeals. Its lead argument is forfeited, as are others it presses, because the government never raised them in the District Court. In any event, all of the government's arguments lack merit. *First*, this Court has squarely held that the presumption of vindictiveness can apply to an initial decision to indict. *Second*, the District Court rightfully rejected the government's argument that the

---

appeal. Unless otherwise noted, case text quotations omit internal citations, footnotes, quotation marks, and previous alterations.

only prosecutorial motives that mattered were those of the U.S. Attorney who presented the case to the grand jury. *Third*, the record contradicts the government's contention that the true reason it indicted Mr. Abrego was because it was concerned that his return to the United States presented a risk to public safety. *Finally*, the District Court properly held, based on the record, that the government failed to rebut a presumption of vindictiveness.

The District Court's decision should be affirmed.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Mr. Abrego Prompts the Government's Ire By Successfully Challenging His Unlawful Deportation

Kilmar Armando Abrego Garcia was born in El Salvador. After facing years of threats of extortion by a gang, he was sent in 2011 to live with his brother in Maryland. *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 507 (D. Md. 2025); *see also* Mem. Op., R. 138, #1516. Though he first entered the country without inspection, he has had legal permission since 2019 to reside in the United States under an order granting him withholding of removal to El Salvador. Mem. Op., R. 138, #1516. Thereafter, Mr. Abrego lived in Maryland with his wife and three children. *Abrego Garcia*, 777 F. Supp. 3d at 508.

On March 12, 2025, while driving home from work with his son, Mr. Abrego was unlawfully arrested by Immigration and Customs Enforcement. *Id.* Three days

later, without any process whatsoever, the government deported him to El Salvador. There, he was imprisoned at CECOT and tortured. Among other things, he was stripped, shackled, and his head shaved; beaten, kicked, and struck with wooden batons; and deprived of sleep, food, and access to a bathroom. Def. Mem. of Law, R. 105, #1242.

Desperate to enforce his right not to be removed to El Salvador and to reunite with his family, Mr. Abrego sued in federal district court in Maryland for his release. *Abrego Garcia*, 777 F. Supp. 3d at 510. On April 4, he succeeded, obtaining an injunction requiring the United States to seek his return. *See Abrego Garcia v. Noem*, No. 25 Civ. 951, 2025 WL 1024654, at *1 (D. Md. Apr. 4, 2025). Three days later, he won again, persuading the Fourth Circuit to deny the government's request for a stay pending appeal. *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025). Concurring opinions explained that "[t]he United States Government has no legal authority to snatch a person who is lawfully present in the United States off the street and remove him from the country without due process. The Government's contention otherwise, and its argument that the federal courts are powerless to intervene, are unconscionable." *Id.* (Thacker, J., concurring); *see also id.* at *6 (Wilkinson, J., concurring) ("There is no question that the government screwed up here.").

Meanwhile, senior federal officials—including the President, the Vice President, and Cabinet members—embarked on a coordinated smear campaign. Vice President J.D. Vance falsely proclaimed that Mr. Abrego "was a convicted MS-13 gang member with no legal right to be here." Def. Mem. of Law, R. 105, #1244. Then-Secretary of Homeland Security Kristi Noem falsely labeled Mr. Abrego "a gang member," a "violent criminal," and "definitely a member of [a] terrorist organization." *Id.* #1245 n.11. Then-Attorney General Pam Bondi called him a "known gang member." *Id.*

On April 10, 2025, Mr. Abrego won again: The Supreme Court unanimously agreed that Mr. Abrego was "improperly sent to El Salvador," and it ordered the government to "facilitate" his "release from custody in El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. at 1018.

### B. While Feigning Inability to Return Mr. Abrego, the Government Reopens an Old Investigation into Him

Four days after the Supreme Court's order, President Trump and Salvadoran President Nayib Bukele held a meeting in the Oval Office, which other U.S. officials attended as well. During the meeting, Bondi stated with cameras rolling that it is "up to El Salvador if they want to return him. That's not up to us." Def. Mem. of Law, R. 105, #1246 n.16. Stephen Miller then told reporters that the Supreme Court had

given El Salvador the "sole discretion" to decide whether to return Mr. Abrego.[2] With President Trump nodding with approval, Bukele then said the opposite: "How can I smuggle a terrorist into the United States? I don't have the power to return him to the United States." Def. Mem. of Law, R. 105, #1246 n.16.

Instead of working to address this faux stalemate, the government doubled down on its public attacks on Mr. Abrego. Administration officials went on social media and television to label him a "gangbanger," "monster," "illegal predator," "illegal alien terrorist," "wife beater," and "human trafficker." *Id.* #1247.

The government also decided to reopen an old investigation of him. Two and a half years before Mr. Abrego's unlawful arrest and removal, he had been pulled over in Cookeville, Tennessee, and then released without so much as a citation. Mem. Op., R. 312, #5084. Homeland Security Investigations ("HSI") Baltimore had then opened an investigation. *Id.* Investigators determined that the vehicle Mr. Abrego had been driving was registered to an individual the government now calls "CC-1." *Id*. HSI agents also surveilled CC-1's home and obtained phone records connecting him to Mr. Abrego. App. to Def. Mem. of Law, R. 306-1, #5040-5041. On April 1, 2025, the investigation was closed without a referral for prosecution.

[2] *Remarks: Donald Trump Holds a Bilateral Meeting with Nayib Bukele of El Salvador*, Roll Call (Apr. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-bilat-nayib-bukele-el-salvador-april-14-2025.

The report memorializing the closure explained: "Investigators have accomplished all goals for this case, and no further investigative efforts will be attributed" to it. Mem. Op., R. 312, #5085.

But "in response to inquiries from headquarters"—inquiries made one week after the Supreme Court's decision, and three days after the Oval Office meeting with Bukele—HSI Baltimore reopened its investigation. Hr'g Tr., R. 300, #4928; Mem. Op., R. 312, #5086. The next day, DHS publicized a "bombshell investigative report" about the traffic stop, which it characterized as a "suspected human trafficking incident." Mem. Op., R. 312, #5087 & n.3. Just five days later, HSI sought to interview CC-1 about Mr. Abrego for the first time. *Id.* #5087.

### C. Officials in Main Justice Prevail Upon Acting U.S. Attorney Robert McGuire to Charge Mr. Abrego

Only after the reopened investigation of Mr. Abrego was already well underway did federal officials in the Middle District of Tennessee become involved. On or about April 21, 2025, then-Special-Agent-in-Charge of HSI Nashville Rana Saoud claimed to have read an article published in the *Tennessee Star* that someone sent to her. Mem. Op., R. 312, #5087-5088; Hr'g Tr., R. 300, #4835-4836, 4854-4855. In testimony that the District Court later found "create[d] more questions than answers," Mem. Op., R. 312, #5096 n.7, Saoud testified she could not remember who had sent the article—only that it was someone she trusted and had "worked with," Hr'g Tr., R. 300, #4854-4855. At any rate, on April 27 (a Sunday), she called

then-Acting U.S. Attorney Robert McGuire to ask whether McGuire had any knowledge of the traffic stop and to discuss HSI Nashville potentially investigating the matter. *Id.* #4826, 4841, 4863.

That same Sunday afternoon, McGuire received an email from Associate Deputy Attorney General Aakash Singh about the investigation of Mr. Abrego. The email did not contain Mr. Abrego's name. Government Exhibit 1, R. 315-1, #5120. Instead, the subject line was the name of CC-1, whom HSI Birmingham had already twice interviewed in a prison in Alabama after HSI Baltimore reopened the investigation into Mr. Abrego. Singh asked McGuire and two other U.S. Attorneys from Texas and Alabama to "set aside some time tomorrow morning to discuss [CC-1] briefly." *Id.* Although McGuire had never heard of CC-1, he testified he knew "[i]nstantly" that the email was really about Mr. Abrego. Hr'g Tr., R. 300, #4865, 4930-4931.

To be clear, the exact timing and origin of ODAG's involvement in the investigation against Mr. Abrego is not in the record, because the government chose not to disclose those facts. But the April 27 email to McGuire makes clear that no fewer than ten days after HSI Baltimore reopened its investigation, ODAG was so steeped in the investigation that Singh knew the name of the government's key cooperator and was directing the use of his testimony to charge Mr. Abrego. McGuire, meanwhile, was hearing about the investigation for the first time.

McGuire followed ODAG's lead. On Monday, April 28, Singh and McGuire got on the phone to discuss getting CC-1 to Nashville and granting him proffer immunity. Mem. Op., R. 312, #5088. The next day, McGuire was drafting a complaint charging Mr. Abrego. *Id.* The day after, McGuire sent an email to Singh saying that he thought it was "reasonable to believe we could have a charging document next week." *Id.* #5088. McGuire also assured Singh: "We are hammering as hard as we can on this effort." *Id.* #5088-5089. Even though McGuire had started drafting a complaint the day before, he later testified that that email was his "first indication" that he "[thought] we're going to charge this case," Hr'g Tr., R. 300, #4935. About ten minutes later, Singh responded: "Awesome news thank you guys. Keep me posted." Mem. Op., R. 312, #5089.

But Singh was not content to let McGuire "keep [him] posted." On his way to becoming known as one of Blanche's "enforcer[s]" and one of his "most senior aides" who "wield[ed] outsize power," *see* Def. Mem. of Law, R. 306, #5019 & n.4, Singh pressed: "How close do we think we are to charging? And can we set up a brief call before charges get filed?" Mem. Op., R. 312, #5089. McGuire reiterated that he would be ready to charge "towards the end of next week," and again assured Singh: "We're all hammering as hard as we can go"; the case "is highest priority for me." *Id.* McGuire noted that he "[d]efinitely planned on a call before going ahead," because he "want[ed] the high command looped in." *Id.*

Singh also asked McGuire about the "potential charges" in this case, discussed whether to proceed by a "speaking indictment," and directed him to "sketch out a draft complaint . . . by 5pm tomorrow." *Id.* #5089-5090. Singh emphasized that this case is "a top priority for us." *Id.* #5090. McGuire understood "us" meant "Main Justice leadership." Hr'g Tr., R. 300, #4947.

The next day, May 1, as Singh requested, McGuire shared a draft affidavit in support of a complaint. Mem. Op., R. 312, #5090. In response, Singh asked if "we have the Baltimore/Maryland report where [Abrego] was arrested with MS-13?" *Id.* McGuire responded that he did not have it and had "never had it," but that he could "ask Baltimore HSI for it." *Id*.

Only on May 2, after McGuire had already drafted a complaint and shared the draft with Singh, did Agent Saoud open the HSI Nashville investigation into Mr. Abrego. *Id*. Singh had been enmeshed in the investigation and the drafting of charges from the start, pushing McGuire along all the while.

On May 15, McGuire circulated a prosecution memo and draft indictment to the leadership team of his office. In this internal communication, McGuire minimized ODAG's role in directing the prosecution, writing that he "would hope to have ODAG eyes on it as we move towards a decision about whether this matter is going to ultimately [be] charged" and asserting that he "ha[d] not received specific direction from ODAG other than [he had] heard anecdotally that the DAG and

PDAG would like Garcia charged sooner rather than later." Gov't Ex. 1, R. 315-1, #5132-5133. McGuire did not share with his leadership team that Singh had told him to provide draft charging documents by a specific date (or that he had done so), or that he had been in constant contact with him about the investigation. *See id.* Nor did McGuire share the source of his "anecdotal[]" knowledge that the "DAG and PDAG would like [Mr. Abrego] charged sooner rather than later." *Id.* #5133.

Ben Schrader—then-Chief of the Criminal Division in the Middle District—responded with "a memorandum recommending against charging [Mr. Abrego]," asking McGuire to "pass it along to relevant parties in D.C. as well." Mem. Op., R. 312, #5091.

On May 17, 2025, as the indictment was being finalized, Jacob Warren, a co-Director of Joint Task Force Vulcan ("JTFV"), a DOJ task force—and McGuire's "partner" on the case, Hr'g Tr., R. 300, #4941—updated Singh. He told Singh that the team was "working over the weekend to finalize an indictment that we will send to you tomorrow night or first thing Monday." Mem. Op., R. 312, #5091. He noted that "[p]er our prior conversations on timelines, we are on track to present an indictment this Wednesday, May 21." *Id.* #5092. At the same time, he asked Singh to "let us know soonest" "[i]f anything on that front has changed." *Id.* In response, Singh thanked Mr. Warren for the "really helpful information," Gov't Ex. 1, R. 315-1, #5129, and instructed him, Christopher Eason (the other co-Director of

JTFV), and McGuire to "keep close hold *until we get clearance*," Mem. Op., R. 312, #5092 (emphasis added).

McGuire would later testify that he did not know what Singh "meant by 'until we get clearance.'" *Id.* #5101. But the District Court rejected this claim, citing the exchange as a prime example of McGuire's "choppy" testimony. *Id.* #5110. McGuire similarly characterized his communications with Singh as a "one-way street," a characterization that also caused McGuire to "lose[] credibility" because "McGuire himself acknowledged dependence on Main Justice for [Mr. Abrego's] return, direction from Singh, congratulatory contact from Blanche, and uncertainty about what was being asked of him." *Id.* In short, "the plain reading" of the May 17, 2025 email exchange "is that Warren sought guidance from Blanche and Singh on several issues. Specifically, he wanted confirmation on the timing of the indictment, whether the indictment would be sealed or not, and the time for a call with Singh." *Id.* #5101.

On May 21, 2025, McGuire presented an indictment to the grand jury, and a true bill was returned. Indictment, R. 3. That same day, Schrader resigned from the U.S. Attorney's Office for the Middle District, effective immediately. Mem. Op., R. 312, #5092.

On June 6, 2025—nearly two months after the Supreme Court had affirmed the order requiring the government to "facilitate" Mr. Abrego's return—Mr. Abrego

arrived in the Middle District of Tennessee. *Id.* McGuire was not aware of Mr. Abrego's return—Blanche called McGuire personally to tell him. Hr'g Tr., R. 300, #4991. That same day, Blanche appeared, along with then-Attorney General Bondi, at a press conference, to announce that Mr. Abrego "has landed in the United States to face justice."[3] McGuire did not attend the press conference.

Shortly after, Blanche gave an interview regarding Mr. Abrego's return, again claiming that Mr. Abrego was returned *not* because an order from the U.S. Supreme Court required the government to facilitate that action, but solely "to face justice." Mem. Op., R. 138, #1520. But in that same interview, Blanche admitted that the government started "investigating" Mr. Abrego after "a judge in Maryland . . . questioned" the government's decision to deport him, found that it "had no right to deport him," and "accus[ed] [the government] of doing something wrong." *Id.* Blanche maintained that the investigation and indictment—not the repeatedly affirmed order to facilitate Mr. Abrego's return—were "why he's back."[4]

[3] *Attorney General Bondi News Conference*, C-SPAN (June 6, 2025), https://www.c-span.org/program/news-conference/attorney-general-bondi-news-conference/660932.

[4] *Attorney General Bondi News Conference*, *supra* note 3.

## II. Proceedings Below

### A. Mr. Abrego's Motion to Dismiss and Discovery

Mr. Abrego responded to the indictment by moving to dismiss the case as a "vindictive prosecution"—that is, a prosecution brought to retaliate against him for exercising his constitutional right to petition the courts for a redress of grievances. After reviewing the parties' initial filings, the District Court held that Mr. Abrego "carried his burden of demonstrating some evidence that the prosecution against him may be vindictive." Mem. Op., R. 138, #1528.

In so holding, the Court noted that Mr. Abrego's successful lawsuit in Maryland imposed a "significant burden" on the government. *Id.* #1523. The Court also pointed to a number of irregular facts: high-ranking officials in Washington singling him out to cast public aspersions upon him; Blanche's statement directly tying the indictment of Mr. Abrego to his Maryland suit, *id.* #1523; the timing of the reopening of the investigation into Mr. Abrego "only days after the Supreme Court's decision" to "side[] with Abrego," "suggest[ing] that Abrego's prosecution may stem from retaliation by the DOJ and DHS," *id.* #1526-1527; and the "years-long delay" in bringing the charges against Mr. Abrego, which set Mr. Abrego's case apart from every other smuggling case involving a traffic stop in this Circuit, *id.* #1527.

The Court's finding that Mr. Abrego demonstrated a presumption of vindictiveness shifted the burden to the government to "rebut[] the presumption with objective, on-the-record explanations." *Id.* #1528. But instead of proffering a witness with direct knowledge of the decision to investigate and charge Mr. Abrego—such as Singh or Blanche—the government moved to quash Mr. Abrego's subpoenas of both officials. *See* Mot. to Quash, R. 181. The District Court reserved decision on the government's motion to quash, "pending the evidentiary hearing" on whether the government could otherwise "rebut [Mr. Abrego's] *prima facie* showing of a realistic likelihood of vindictiveness." Order, R. 281, #4685-4686.

In advance of the hearing, the government produced a small amount of documentary discovery. It also indicated that it would call three witnesses to testify: Saoud, McGuire, and Supervisory Special Agent John Van Wie of HSI Baltimore. Of the three, Van Wie was the person the government "identified" as having "knowledge of the 'decision to reopen the investigation into [Mr. Abrego's] human smuggling activities' (Doc. No. 196 at 1)—the decision that the Court had identified as central to [Mr. Abrego's] motion." Mem. Op., R. 312, #5096. But at the hearing itself, the government declined to call Van Wie to the stand. Instead, the government elicited testimony only from Saoud and McGuire.

### B. The District Court's Dismissal

After considering all of the evidence submitted, the District Court held that the government had not rebutted the presumption of vindictiveness and granted Mr. Abrego's motion to dismiss the indictment. *Id.* #5113. The District Court observed that McGuire was the only testifying witness of the two who had any knowledge—albeit only "secondhand" knowledge—of the "decision that the Court had identified as central to Abrego's motion": why the investigation of Mr. Abrego was reopened just seven days after the government was ordered to facilitate his return. *Id.* #5095-5096. The District Court also emphasized that the government's witnesses could not explain why the reopening of the investigation was followed by a "public-facing campaign, with the Executive Branch's fingerprints, tying Abrego to the November 2022 traffic stop." *Id.* #5096-5097.

As for the documents and testimony that were adduced at the hearing, "persuasive, credible, objective evidence" confirmed that ODAG instigated and orchestrated this case as retaliation against Mr. Abrego for successfully challenging his illegal removal. *Id.* #5108. Among other things, the District Court pointed to Blanche's statement that the investigation of Mr. Abrego began "after a judge in Maryland 'questioned' the Executive Branch's decision to deport him." *Id.* #5098. The District Court also stressed that Singh, Blanche's enforcer, was leading the prosecution before McGuire even knew about it, delivering CC-1 to McGuire,

exerting oversight thereafter, and ultimately providing the requisite "clearance" to charge the case. *Id.* #5099-5100. Finally, the District Court rejected the government's argument that the "new" evidence regarding Mr. Abrego's "activities" organically spawned the renewed investigation and charges here. *Id.* #5103-5107. The evidence the government cited "was not newly discovered or previously unavailable." *Id.* #5098.

## SUMMARY OF THE ARGUMENT

Based on the particular facts of the case, the District Court held that Mr. Abrego established a "realistic likelihood of vindictiveness," and that the government failed to rebut that presumption. None of the government's challenges to those determinations has merit.

I. The District Court did not abuse its discretion in finding that a presumption of vindictiveness arises on this record. *First*, the government's argument that a presumption cannot apply to initial charging decisions is forfeited and, in any event, foreclosed by Circuit precedent. *Second*, the government's argument that the District Court erred by considering the motives of officials in Main Justice—and not just the local U.S. Attorney—also contravenes binding precedent. This Court has held that unconstitutional vindictiveness exists where the charging prosecutor was prevailed upon by others to retaliate against the defendant. *Third*, the government's argument that its conduct here was objectively reasonable is also forfeited and meritless. The

government never pressed the argument below (seemingly for strategic reasons). In any event, an accurate understanding of the factual situation here makes clear that the government indicted Mr. Abrego to punish him for challenging his illegal deportation, not for any public safety reason.

II. Nor did the District Court clearly err in finding that the government did not rebut the presumption of vindictiveness. The District Court reasonably found the U.S. Attorney's self-serving testimony that he acted wholly independently here was contradicted by all of the other evidence in the case and was not credible. The District Court also correctly determined that the evidence the government discovered after rebooting its investigation into Mr. Abrego did not explain its decision to indict. That decision was made by officials in Main Justice before that evidence was generated.

III. If the Court does hold that the District Court erred, it should remand for further proceedings to allow the District Court to conduct further discovery and assess Mr. Abrego's claim of actual vindictiveness, which the District Court declined to reach in light of its dismissal on other grounds.

## STANDARD OF REVIEW

The District Court's "ultimate decision whether to dismiss an indictment for prosecutorial vindictiveness is reversible only if the district court abused its discretion." *LaDeau*, 734 F.3d at 565; *see also Zakhari*, 85 F.4th at 378-79. The

District Court's subsidiary determinations regarding whether elements in the vindictive-prosecution framework are satisfied are also reviewed for "abuse of discretion." *LaDeau*, 734 F.3d at 570-73. And where, as here, those decisions rest on a district court's factual findings, those findings must stand unless "clearly erroneous." *Id.* at 566; *Zakhari*, 85 F.4th at 379.

Under clear error review, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). "[W]hen the district court's factfinding is based on its conclusions about the credibility of a witness, its findings are due even greater deference." *Torres v. MacLaren*, 798 F. App'x 916, 920 (6th Cir. 2020); *see also Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 723 (6th Cir. 2003) ("[W]e are not free to disregard the district court's credibility assessment.").

## ARGUMENT

"The Fifth Amendment forbids the government from punishing defendants for exercising their constitutional and statutory rights." *Zakhari*, 85 F.4th at 379. Indeed, "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Therefore, "a prosecutor's broad discretion in deciding whom to

prosecute and which charges to bring is not unfettered." *LaDeau*, 734 F.3d at 566. The Fifth Amendment prohibits the government from using an indictment to retaliate against an individual who challenges illegal government action. *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir. 1989).

This "restrain[t]" on the federal government's power to prosecute is enforced through motions to dismiss an indictment "on grounds of prosecutorial vindictiveness." *LaDeau*, 734 F.3d at 566. A defendant can prevail on a vindictive-prosecution challenge in two ways. First, a defendant can show "actual vindictiveness—that is, objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." *Id.* Second, a defendant can show that, "in the particular factual situation presented, there existed a realistic likelihood of vindictiveness for the prosecutor's action." *Id.*; *see also United States v. Howell*, 17 F.4th 673, 687 (6th Cir. 2021). Where a defendant follows the latter pathway and makes a *prima facie* showing of a realistic likelihood of vindictive prosecution, "a presumption arises in [the] defendant's favor," and the burden shifts to the government to rebut it. *Zakhari*, 85 F.4th at 379.

Contrary to the government's contentions, the District Court did not abuse its discretion in finding that a presumption of vindictiveness applies here. It also did not clearly err in finding that the government failed to rebut that presumption.

## I. The District Court Did Not Abuse Its Discretion By Applying a Presumption of Vindictiveness to This Case

Assessing the evidence before it, the District Court concluded that a presumption of vindictiveness applies here. In support of that determination, the District Court pointed to Mr. Abrego's successful exercise of his statutory and constitutional rights; the government's public statements expressing frustration at this litigation and disparaging him; Main Justice's quick orchestration of a campaign to indict Mr. Abrego; and the "atypical" benefits the government granted to cooperators to secure an indictment. Mem. Op., R. 312, #5093, #5095-5102.

The government's challenges to the District Court's invocation of a presumption of vindictiveness fail. *First*, the government's argument that the presumption of vindictiveness cannot apply to an initial indictment is forfeited and in direct conflict with binding Sixth Circuit precedent. *Second*, the District Court correctly considered the motives of governmental officials in Washington, D.C., rejecting the government's myopic focus on the local U.S. Attorney. *Third*, the government's argument that its conduct here was objectively reasonable is forfeited and contradicted by the facts in the record.

### A. The Government's Argument that a Presumption of Vindictiveness Cannot Apply to an Initial Indictment Is Forfeited and Meritless

The government argues that "the doctrine of presumptive vindictiveness 'does not extend to the . . . pretrial phase' of proceedings generally, and certainly not to an

initial indictment." Gov't Br. 18 (quoting *United States v. Mincy*, No. 24-4019, 2025 WL 3269350, at *7 (6th Cir. Nov. 24, 2025) (Readler, J., concurring)); *id.* at 24-25. The government forfeited that argument by failing to raise it before the District Court. And it is directly contradicted by binding Sixth Circuit precedent.

*1. The Government Forfeited This Argument*

"[A]s a general rule, our system 'is designed around the premise that parties . . . are responsible for advancing the facts and argument entitling them to relief.'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). Accordingly, a legal argument that is not raised in the district court is forfeited. *See United States v. Noble*, 762 F.3d 509, 527-28 (6th Cir. 2014); *Greer v. United States*, 938 F.3d 766, 770 (6th Cir. 2019) ("Typically, this court reviews only those issues adequately preserved for appeal."). "The government, like other litigants, . . . can forfeit or waive" arguments by failing to raise them before the trial court. *Noble*, 762 F.3d at 527; *see also Hunter v. United States*, 160 F.3d 1109, 1113 (6th Cir. 1998) ("[T]he government can forfeit [an] argument by failing to raise it in a timely fashion.").

Such is the case here. Before the District Court, the government did not argue either that the presumption of vindictiveness cannot apply in the pretrial context, or that the presumption cannot apply to an initial indictment. The government did not

raise this argument in its opposition to Mr. Abrego's motion to dismiss, *see* Gov't Resp. to Mot. to Dismiss, R. 121, in its pre-hearing brief, *see* Gov't Pre-Hr'g Br., R. 197, or in its post-hearing brief, *see* Gov't Post-Hr'g Br., R. 307. The government has therefore forfeited those arguments.

This Court's power to address forfeited arguments is "limited," *United States v. Olano*, 507 U.S. 725, 731 (1993), and the Court will exercise it only in "exceptional cases," *Greer*, 938 F.3d at 770. Under Federal Rule of Criminal Procedure 52(b), a court of appeals may correct an erroneous district court ruling based on a forfeited argument "only if [the error] is plain and affects substantial rights." *Olano*, 507 U.S. at 732; *see also Noble*, 762 F.3d at 528. Here, the government does not argue that it can satisfy the plain error standard. Any such argument is therefore itself forfeited.

In any event, the District Court could not have committed plain error here. As explained in the next section, the District Court relied on binding Sixth Circuit precedent to hold that the presumption of vindictiveness could apply in this setting. Where, as here, a district court "relie[s] upon clearly established Sixth Circuit precedent," the court's decision "do[es] not constitute plain error." *Layman v. Alloway Stamping & Mach. Co.*, 98 F. App'x 369, 374 (6th Cir. 2004); *see Olano*, 507 U.S. at 734 (holding the "court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law").

### 2. *Binding Precedent Forecloses the Government's Argument*

Even if this issue were somehow preserved, the government would still lose. Relying on *United States v. Goodwin*, 457 U.S. 368 (1982), the government contends that a presumption of vindictiveness cannot ever arise in a pretrial setting, or at least not to a decision to indict. Gov't Br. 33-40. But as the government itself acknowledges, this Court has "twice applied the presumption in the pretrial setting." *Id.* at 36. In one of those cases, this Court explicitly rejected the argument the government makes here, holding that the government was "incorrect to suggest that *Goodwin* categorically bars a district court from" applying the presumption "in the pretrial setting." *LaDeau*, 734 F.3d at 567. In the second, the court applied a presumption to a superseding indictment adding charges before trial. *Zakhari*, 85 F.4th at 380-81; *see also United States v. Andrews*, 633 F.2d 449, 454 (6th Cir. 1980) (en banc) (declining to "accept the government's argument that the prosecutorial stake in a pretrial setting is always so de minim[i]s that there can never be a 'realistic likelihood of vindictiveness' in a pre-trial setting").

Several circuits also reject the government's reading of *Goodwin*. The D.C. Circuit, for example, has held that "[t]he lesson of *Goodwin*" is that there is no *categorical* presumption of vindictiveness when a prosecutor adds new charges before trial, but when distinctive facts are present that create "a realistic likelihood" of vindictiveness, "a presumption will lie in the pretrial context." *United States v.*

*Meyer*, 810 F.2d 1242, 1246 (D.C. Cir. 1987). The Tenth Circuit likewise has "rejected the idea that a presumption of vindictiveness may never arise in the pretrial setting." *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991). And the Eleventh Circuit has held that "nothing in the language or rationale of *Goodwin* rules out the possibility that a case could present additional factors that would make it appropriate to use the presumption in a pre-trial setting." *United States v. Barner*, 441 F.3d 1310, 1317 (11th Cir. 2006).

Faced with this precedent, the government retreats to arguing that the presumption of vindictiveness cannot apply to "initial charging decisions." Gov't Br. 37. Again, precedent counsels otherwise. In *United States v. Adams*, the defendant claimed that she had been vindictively indicted for tax fraud in retaliation for bringing an employment discrimination suit against the government. 870 F.2d at 1141. This Court explained that "where there has been a *prima facie* showing of 'a realistic likelihood of vindictiveness,' it is incumbent upon the district court to 'conduct an evidentiary hearing where the government's explanations can be formally presented and tested.'" *Id.* at 1146 (quoting *Andrews*, 633 F.2d at 457). It then remanded for further proceedings to determine whether the facts warranted such "an evidentiary hearing [to] be held." *Id.*

The government treats *Adams* as an "actual vindictiveness" case. Gov't Br. 31. But that is incorrect. When that case returned to this Court, the panel

distinguished a claim of "actual vindictiveness" from one alleging "a realistic likelihood of vindictiveness which will give rise to a *presumption of vindictiveness*." *United States v. Adams*, No. 93-5682, 1994 WL 589509, at *1 (6th Cir. 1994) (emphasis added). And it confirmed that Adams was alleging a "realistic likelihood of vindictiveness." *Id.* at *1 & n.1.

All this explains why, years later, this Court explained without qualification that "defendants may challenge the government's *charging decisions* for actual *or presumptive* vindictiveness." *Zakhari*, 85 F.4th at 379 (emphasis added). To be sure, there is no *categorical* presumption in this setting. But a presumption can arise based on "the particular factual situation presented." *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001); *accord LaDeau*, 734 F.3d at 566. And that rule makes sense. "The Fifth Amendment forbids the government from punishing defendants for exercising their constitutional and statutory rights." *Zakhari*, 85 F.4th at 379. And regardless of whether such punishment takes the form of additional or renewed charges in a preexisting case or initial charges, the government is often in sole possession of the evidence needed to prove such retaliation. The pathway of a presumption and burden-shifting is sometimes just as necessary and justified in either situation.

Nor is this Court alone in holding that a presumption of vindictiveness can apply to initial charging decisions. In *United States v. Miller*, 948 F.2d 631 (10th

Cir. 1991), the defendant "maintain[ed] the criminal indictment against him was brought solely in response to his civil lawsuits; that is, that the criminal indictment was vindictive in origin." *Id.* at 632. Citing *Goodwin* and its own precedent rejecting any bar against vindictiveness challenges to "pretrial . . . prosecutorial decisions," the Tenth Circuit "examin[ed] the particular circumstances in deciding whether a presumption of vindictiveness is appropriate." *Id.* at 633-34. In *United States v. Southern Poverty Law Center, Inc.*, ___ F. Supp. 3d ___, 2026 WL 2280675 (M.D. Ala. 2026), the district court similarly "assum[ed] that a presumption of vindictiveness can apply" to an initial charging decision. *Id.* at *9.

That leaves the government to argue that "no court" has actually "applied a presumption of vindictiveness to the initial indictment." Gov't Br. 4. It's true that in neither *Adams*, *Miller*, nor *Southern Poverty Law Center* did the court find the defendants had carried their burden on the particular facts of those cases to establish a presumption. But the government overlooks *United States v. Carey*, 816 F. Supp. 3d 129, 144 (D.D.C. 2026), in which the U.S. District Court for the District of Columbia held that a defendant established a presumption that he was vindictively indicted for engaging in protected speech. Anyhow, even if the government had actually preserved this argument, the legal question here would be whether a presumption of vindictiveness can arise with regard to an initial indictment, if the

facts in a particular case warrant it. Ample authority from this Circuit and others demonstrates it can.[5]

### B. The District Court Permissibly Looked to Individuals Beyond the Local U.S. Attorney to Discern the Government's Motives

The government next argues that the only person whose motives mattered for purposes of determining whether a presumption of vindictiveness applies here is the local U.S. Attorney who filed the indictment, Robert McGuire. Gov't Br. 27-32. The government also contends that McGuire could not have had a retaliatory motive. *Id.* at 26. The government is wrong both legally and factually. As a legal matter, the District Court correctly held that the motivations of superiors who "prevail upon" a prosecutor to indict are "highly relevant" to the vindictive prosecution analysis. Mem. Op., R. 185, #1850-51 (quoting *Adams*, 870 F.2d at 1146). And even if they

[5] The government argues that other circuits disagree. Gov't Br. 36. It also points to an unpublished decision in which Judge Readler wrote separately to argue that this Court should overturn its precedent and hold that a presumption of vindictiveness does not apply "in the pretrial context." *Mincy*, 2025 WL 3269350, at *7 (Readler, J., concurring). But most of the cases the government cites involved amended indictments in the midst of ongoing pretrial litigation, where "charging decisions are provisional and part of an evolving negotiation" between the government and the defendant. *Id.* And none of those cases involved what this case does: a criminal indictment brought in retaliation for successfully opposing removal from the United States. Because removal itself is "a particularly severe penalty"—closely akin to "a criminal sanction," *Padilla v. Kentucky*, 599 U.S. 356, 364 (2010)—this setting much more closely resembles the classic vindictive-prosecution scenario where a categorical presumption of vindictiveness applies: the government bringing harsher charges against a defendant after he "succeeded in getting his original conviction set aside." *North Carolina v. Pearce*, 395 U.S. 711, 723-24 (1969).

weren't, the District Court found that the motivations of McGuire himself were likely compromised, and that finding was not clearly erroneous. Mem. Op., R. 312, #5101.

To begin, even if the government is right that no presumption of vindictiveness can arise where the charging decision at issue was made by a prosecutor with *no connection* to anyone with a stake in the earlier litigation allegedly giving rise to a retaliatory motive, that is not this case. Circuit law is clear that unconstitutional vindictiveness exists where the prosecutor is "prevail[ed] upon" by a vindictive actor. *Adams*, 870 F.2d at 1146. In *Adams*, therefore, this Court held that "if the EEOC was able to prevail upon the Department of Justice to institute a prosecution that would not have been undertaken but for Ms. Adams' exercise of her statutory right to sue, it does not seem to us that EEOC's motivation is irrelevant." *Id.* Quite the contrary; it could have been outcome-determinative. *Id.*

The government's only answer is to again try to sideline *Adams* as an "actual vindictiveness case." Gov't Br. 31. As explained above, however, the government is wrong. *See supra* at 27-28. *Adams* was a presumption case and holds that the retaliatory motives of governmental officials who prevail upon a prosecutor to bring charges can give rise to a presumption of vindictiveness.

And, in so holding, this Court is in good company. *See United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (defendant may establish vindictiveness where the

prosecutor "was prevailed upon to bring the charges by another with animus"); *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir. 1996) (defendant must show that "the ill will, whoever its bearer, actually motivated his prosecution" and the bearer "in some way prevailed upon the prosecutor in making the decision to seek an indictment"); *S. Poverty L. Ctr.*, 2026 WL 2280675, at *10 ("[B]ecause prosecutors do not operate in a vacuum, the Court can consider whether the prosecutor was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'").

This array of precedent comports with the Supreme Court's recognition of the "cat's paw" theory to establish retaliatory intent in other contexts. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). Under that theory, a litigant can prove retaliation by "establish[ing] that [a] person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action," or, "[p]ut another way, . . . used the decisionmaker to bring about the intended retaliatory action." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015); *see also Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 420-21 (6th Cir. 2021) (applying cat's paw theory to retaliation claim); *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017) (same). So too here.

Turning to the facts, the District Court found as an initial matter that "Main Justice exercised control over the charging decision down to the finish line." Mem.

Op., R. 312, #5101. Blanche publicly admitted that the government began investigating Mr. Abrego following the Supreme Court's order. This "tie[d] Main Justice to the tainted investigation and confirm[ed] what motivated it." *Id.* #5095. And Blanche's office, ODAG, gave McGuire his key witness before McGuire knew anything about the case, asked about additional evidence before McGuire had ever seen it, and pushed McGuire to draft charging documents. *See supra* at 10-14. All in all, the record contains "persuasive, credible, objective evidence" creating a reasonable likelihood that ODAG directed McGuire to indict Mr. Abrego in retaliation for exercising his right to challenge his removal. Mem. Op., R. 312, #5108. Under binding precedent, that is sufficient to trigger a presumption of vindictiveness.

If it mattered (and it doesn't), there is also sufficient reason to believe McGuire shared this retaliatory motive. The government argues this cannot be so because McGuire lacked a "personal stake" in the attempted removal of Mr. Abrego. Gov't Br. 26. A personal stake in vindicating prior litigation, however, is just one way of proving that a prosecutor had "motivation" to punish the defendant for previously enforcing his rights against the government. *Chaffin v. Stynchcombe*, 412 U.S. 17, 27 (1973); *see also Goodwin*, 457 U.S. at 383-84. Here, McGuire had strong motivation in this regard. He faced "pressure from DOJ" and knew that ODAG deemed Mr. Abrego's prosecution a "top priority." Mem. Op., R. 312, #5100, 5110-

5111. McGuire also "knew that DOJ attorneys had been warned that delaying or impeding the Department's mission could result in discipline or termination." *Id.* #5110-5111. "McGuire offered no objective explanation for how he insulated [his] charging decision from that pressure." *Id.* #5111.

### C. The Government's Argument That Its Decision to Charge Mr. Abrego Was Objectively Reasonable Is Forfeited and Meritless

The government next argues that its conduct was reasonable—and that a presumption of vindictiveness therefore could not have arisen—because filing this indictment was supported by a need to protect public safety. Gov't Br. 40-51. The government never made this argument below, so it is also forfeited. In any event, the District Court's factual finding that the government instead indicted Mr. Abrego to punish him for challenging his removal was well grounded in the evidence, and certainly not clearly erroneous.

#### *1. The Government Has Forfeited This Argument*

The government complains that "[t]he district court never grappled with the government's evident and objectively legitimate reasons to prosecute Abrego." Gov't Br. 47. But there is a simple reason why that is so: The government never raised any such argument below. Consequently, this argument is forfeited—and this Court should ignore it.

Inasmuch as the government maintains it indicted Mr. Abrego *because of* his impending presence in the country—not to punish him for bringing his lawsuit—it

would be particularly inappropriate for this Court to consider that argument. That is not an argument about objective reasonableness but rather about the government's purported "true" motivation—an argument that does not go so much to whether a presumption of vindictiveness exists as to whether the government has rebutted it. The government appears to recognize as much when it incorporates the argument by reference at the beginning of Part II of its brief, in an effort to "rebut[] the presumption" of vindictiveness. Gov't Br. 51. The whole point of burden-shifting frameworks that first ask whether a "reasonable likelihood" of improperly motivated behavior is present and, if so, shift the burden to the government to offer its reasons for taking the action, is to elicit the government's purported motives in the district court so they can be subjected to adversarial testing. All the more so where, as here, the government's factual argument would have required the trial court to make "determinations of credibility and demeanor" that "lie peculiarly within a trial judge's province." *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019); *see also Torres*, 798 F. App'x at 920.

Indeed, in the context of legal frameworks designed to suss out the government's or another defendant's motives, courts of appeals have consistently held that the government or other decisionmaker must raise any explanations for its conduct before the district court. For example, in the *Batson* context, courts have held that "the validity of the government's challenged peremptory challenges must

stand or fall on the reasons provided to the district court during the *Batson* inquiry" and have thus rejected "after-the-fact rationale[s]" not raised in the district court. *E.g.*, *United States v. Brasher*, 962 F.3d 254, 267 (7th Cir. 2020); *see also United States v. Watkins*, 107 F.4th 607, 621 (7th Cir. 2024) ("[H]aving forfeited its opportunity below, the government has relinquished its right to supply its reasons on appeal."). Similarly, in the employment discrimination context, courts have refused to consider a defendant's arguments that a plaintiff failed to establish a prima facie case where those arguments were not raised before the district court. *See, e.g.*, *Shea v. Kerry*, 796 F.3d 42, 56 (D.C. Cir. 2015).

The same is true here. "For purposes of efficiency and fairness, our legal system is replete with rules requiring that certain matters be raised at particular times." *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). This is one of those rules. If the government fails in the district court to offer a factual reason that makes apparent retaliation actually reasonable, it cannot do so for the first time in the court of appeals. Allowing such sandbagging would defeat the entire purpose of the governing legal framework. *See Zakhari*, 85 F.4th at 379.

Lest there be any doubt, the government was given a raft of opportunities in the District Court to proffer objective reasons for its decision to indict, culminating in the February 26 evidentiary hearing and its post-hearing brief filed thereafter. But it failed to do so. In that brief, the government did not argue that it investigated and

indicted Mr. Abrego because he was being returned to the United States in accordance with the Supreme Court's order. It argued the opposite—that "[t]he decision to seek an indictment against Defendant was made by Mr. McGuire alone," guided only by whether he believed, based on the evidence, that Mr. Abrego had committed the crime. Gov't Post-Hr'g Br., R. 307, #5048, #5060-61. The government asserted that the timing of Mr. Abrego's indictment was purely "based on new evidence obtained by [McGuire's] own investigative efforts" and "had *nothing to do with* Defendant's Maryland lawsuit." *Id.* #5060 (emphasis added). And McGuire claimed at the hearing that even though the Supreme Court had ordered the government to facilitate Mr. Abrego's return, he "didn't know how that was going to shake out, and [he] wasn't going to be involved in that part of it." Hr'g Tr., R. 300, #4898.

It is important to stress here that numerous other officials could have spoken to whether the decision to reopen the investigation into Mr. Abrego had any relation to any worry that bringing him back to this country would pose a threat to public safety. Singh and Blanche certainly would have known what motivated their own decisions, and Van Wie would have known why he closed and then re-opened the investigation into Mr. Abrego. But the government didn't call any of them to the stand. In fact, the government repeatedly resisted producing those or other witnesses who could speak to this issue and discovery relevant to it. The government moved

to quash subpoenas to Singh and Blanche, *see supra* at 17, and at numerous points simply refused to produce discovery from Main Justice relevant to this precise question. *See, e.g.*, Gov't Status Report, R. 147; Gov't Opp'n to Mot. to Compel, R. 178. And despite identifying Van Wie as a "person with knowledge of the 'decision to reopen the investigation into Abrego's human smuggling activities,'" the government chose not to call him to explain that decision. Mem. Op., R. 312, # 5096 (quoting Gov't Witness List, R. 196, #1916).

Indeed, the only time the government even gestured at this factual argument below is when it was opposing Mr. Abrego's motion to compel the government to produce any vindictive prosecution discovery at all. *See* Gov't Opp'n to Mot. to Compel, R. 178, #1811. When it lost that battle and ultimately had to produce discovery relevant to Mr. Abrego's claims, the government made the calculated decision to abandon this "public safety motivation" argument instead of risking the prospect of discovery and testimony from those at Main Justice whom it was seeking to shield.

The government cannot take that decision back now. "[H]aving forfeited its opportunity below, the government has relinquished its right to supply its reasons on appeal." *Watkins*, 107 F.4th at 621.

### 2. *At Any Rate, the Record Contradicts This Argument*

Even if the government's argument were not forfeited, it would still fly in the face of the facts.

An objective reasonableness inquiry depends on "the particular factual situation presented." *LaDeau*, 734 F.3d at 566. And the government misdescribes the factual situation here. It claims that as a result of Mr. Abrego's litigation and the resulting Supreme Court order, Mr. Abrego's "deportation now had to be undone." Gov't Br. 42. But at the meeting between President Trump and Bukele in the Oval Office, just four days after the Supreme Court's order, both Bondi and Bukele explained to the press and the world that that order did not require them to bring Mr. Abrego home. Bondi and Bukele added that they were actually *unable* to return Mr. Abrego to the United States and would not even try to accomplish that feat. Def. Mem. of Law, R. 105, #1246 n.16; *see also supra* at 7-8. Therefore, the true situation—at least from the government's perspective—was that Mr. Abrego was *not* slated to return to the United States anytime soon.

Viewed through that lens, even if the District Court had the opportunity to consider the argument the government has now raised for the first time on appeal, the government's actions would still have been objectively unreasonable. If the government deports someone because it is worried the person poses a public safety risk, *and* the person is *not* returning to the country, it is presumptively vindictive to

bring him back to the country and indict him. The government does not contend otherwise.

The government's purported "true motivation" version of this argument fares no better. Based on the record the government created at the February 26 hearing, the District Court held that the government reopened the investigation "to justify the Executive Branch's decision to remove [Mr. Abrego] to El Salvador," not because of any serious concern for public safety due to Mr. Abrego's return. Mem. Op., R. 312, #5107. The Court also explained that the actions of Singh, orchestrating and driving this prosecution because of "Abrego's successful lawsuit" supplied "direct evidence of vindictive prosecution." *Id.* #5099-5102. Saoud testified that Mr. Abrego was "not a public safety threat" at the time the government decided to prosecute him. Hr'g Tr., R. 300, #4856. And McGuire himself admitted that when he was investigating Mr. Abrego, he did not know whether Mr. Abrego would be returned to the United States at all. *Id.* #4897-4898.

Despite the government's arguments to the contrary, Gov't Br. 48-50, Blanche's statements are also in accord. Blanche confirmed that Mr. Abrego was not returned to the United States because the Supreme Court ordered the government to do so. Instead, he was returned only *because of the indictment*—"to face justice. Period." *Id.* at 13. And in a part of that interview that the government ignores, Blanche confirmed that "the reason that [Mr. Abrego] was returned and the

facilitation that brought him back here *is not a judge*; it's an arrest warrant issued by a grand jury in the Middle District of Tennessee. . . . That's why he's back, and that's why the government of El Salvador agreed to bring him back—because of a federal arrest warrant."[6]

In short, even if the government's own "after-the-fact rationale[s]" were considered, *Brasher*, 962 F.3d at 267, it's the government that gets it backwards, not the District Court. Mr. Abrego was not reinvestigated and indicted because the government had to return him and was therefore concerned for public safety. Instead, he was reinvestigated and indicted in retaliation for his successful lawsuit, while the government deemed the resulting Supreme Court order to facilitate his return to be ineffectual and nonbinding.

## II. The District Court Did Not Abuse Its Discretion in Holding That the Government Failed to Rebut the Presumption

Once a presumption of vindictiveness has been established, the government's "subjective good faith" in the prosecution is not enough to rebut it. *Andrews*, 633 F.2d at 456; *see also LaDeau*, 734 F.3d at 572. Only "objective, on-the-record explanations can suffice," such as "governmental discovery of previously unknown evidence" or "previous legal impossibility." *Bragan*, 249 F.3d at 482; *see also*

---

[6] *Kilmar Abrego Garcia Was Indicted on 'Very Serious' Charges, US Deputy Attorney General Says*, Fox News (June 6, 2025), https://www.foxnews.com/video/6373969491112 (emphasis added).

*Zakhari*, 85 F.4th at 379; *Andrews*, 633 F.2d at 456. And once the government advances a purported explanation, the trial judge must "assess the plausibility" of that explanation. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *see also Duffy v. Sarault*, 892 F.2d 139, 145 (1st Cir. 1989) (proffered reasons where retaliation is presumed are "best judged by a trier of fact, particularly where credibility determinations will be made").

The District Court did not clearly err—indeed, it was correct—in finding that the government failed to proffer an explanation sufficient to rebut a presumption of vindictiveness. Mem. Op., R. 312, #5113. The government's arguments to the contrary are to no avail.

### A. The District Court's Finding That McGuire's Testimony Was Not Credible Was Not Clearly Erroneous

The government first argues that McGuire operated "independent[ly]" from his superiors in Main Justice and singularly made "the charging decision" here. Gov't Br. 51-52. Indeed, the government goes so far as to suggest McGuire had "total autonomy" and did nothing more than "coordinat[e] with DOJ officials" in an ordinary, workaday manner. *Id.* at 52-53. As should be apparent by now, the District Court made detailed factual findings to the contrary, determining that McGuire was actually acting under pressure from officials in Main Justice who were orchestrating the criminal charges against Mr. Abrego. *See supra* at 33-34. Those findings—based

on "persuasive, credible, objective evidence," Mem. Op., R. 312, #5108—are far from clearly erroneous; they are not even susceptible to serious debate.

Accordingly, the government's argument here really boils down to claiming that the District Court erred by declining to credit McGuire's testimony that he made the decision entirely on his own to indict Mr. Abrego. This argument fails for two reasons.

First, it runs afoul of this Court's admonition that "subjective good faith assertions by prosecutors" regarding their reasons for bringing cases are insufficient to overcome a presumption of vindictiveness. *Andrews*, 633 F.2d at 456. In *LaDeau*, for example, this Court held that the government's self-serving affidavit "assert[ing] that the Assistant United States Attorney who had been prosecuting LaDeau's case had intended all along to supersede with a conspiracy-to-receive charge" and "that no member of the United States Attorney's office 'would seek to retaliate against a defendant because he or she has filed a motion to suppress'" was not "sufficiently 'objective'" to rebut the presumption of vindictiveness. 734 F.3d at 565, 572. As in *LaDeau*, the government here relies on McGuire's self-serving statements that he acted with integrity. Those statements cannot rebut a presumption of vindictiveness.

Second, to the extent the District Court was able to consider McGuire's testimony on this point, the court expressly found that his "stated independence" had limited "credib[ility]" because his testimony was "choppy" and "at odds with all of

the other evidence before the Court." Mem. Op., R. 312, #5108-5110. The District Court relatedly emphasized that "McGuire offered no objective explanation for how he insulated the charging decision from th[e] pressure" Main Justice exerted on him. #5111. These considerations "undermine[d] how much consideration McGuire's testimony deserve[d]"—to the point of not much at all. *Id.* #5110.

The District Court's credibility assessment—based not only on the totality of the record but also on observing McGuire on the stand—"lie[s] peculiarly within a trial judge's province." *Flowers*, 588 U.S. at 303; *see also Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 723 (6th Cir. 2003) ("[W]e are not free to disregard the district court's credibility assessment.").The assessment is also supported by specific inconsistencies in McGuire's testimony. For instance, the District Court observed that in his affidavit filed before the hearing, McGuire represented that he had "no correspondence (email, text, call, letter, etc.)" with the Office of the Attorney General or Blanche about the prosecution. McGuire Suppl. Aff., R. 178-1, #1817. On cross-examination, however, he acknowledged that Blanche had called him when Mr. Abrego was returned to the United States to congratulate him. Mem. Op., R. 312, #5110. The Court concluded that McGuire "los[t] credibility" when he described his communications with Main Justice as a "one-way street," only to acknowledge "dependence on Main Justice for [Mr.] Abrego's return, direction from

Singh, congratulatory contact from Blanche, and uncertainty about what was being asked of him." *Id*.

Even if this Court were "convinced" that, "had it been sitting as a trier of fact, it would have weighed" McGuire's testimony differently for some reason, the District Court's decision to accord McGuire's testimony minimal weight was undoubtedly based on a "permissible view[] of the evidence." *Anderson*, 470 U.S. at 573-74. That being so, the District Court's decision "cannot be clearly erroneous." *Id.* at 574.

### B. The District Court's Finding That the Government's "New" Evidence Did Not Motivate the Charging Decision Was Not Clearly Erroneous

The government lastly asserts that the District Court erred by setting aside what it calls "new evidence that emerged after Abrego had been ordered to return." Gov't Br. 55-57. According to the government, the District Court erroneously rejected that evidence on the ground that it could have been discovered earlier with "due diligence." *Id.* at 56. This argument misapprehends the District Court's full reasoning.

Perhaps a court should not fault the government for "investigative delay" attributable solely to resource management or other benign factors. Gov't Br. 65. But that is not the situation here. The District Court did not just find that the Government could have found the evidence it now highlights sooner if it had

exercised greater diligence; it found that the reboot of the investigation that generated that evidence was "tainted" by a retaliatory motive. Mem. Op., R. 312, #5103-5105. Any new evidence therefore could "not explain the Government's decision to first remove [Mr.] Abrego to El Salvador and not prosecute him and then do just the opposite," as the District Court found. *Id.* #5105. Only the government's desire to punish Mr. Abrego for his lawsuit challenging his removal could explain the government's decision to indict.

Consider, for example, the star cooperating witness's testimony. The District Court found that the witness was not discovered by McGuire but "delivered" by Singh. *Id.* #5105. And by the time McGuire "inherited" that witness, the decision to prosecute Mr. Abrego had already been made. *Id*. #5105-5106. The remaining evidence the government identifies—the license plate reader data and interviews or testimony of other witnesses or cooperators, Gov't Br. 55—was similarly all "developed after McGuire had already committed to prosecution." Mem. Op., R. 312, #5107. As such, the District Court sensibly concluded that none of the government's proffered new evidence could explain the government's about-face and decision to charge Mr. Abrego with a crime. That evidence was simply fodder to help justify the decision that had already been made.

## III. If the District Court Erred, the Court Should Remand for Further Proceedings

If this Court holds that the District Court should not have applied a presumption of vindictiveness, or that the government rebutted it, this Court should remand for further proceedings concerning Mr. Abrego's motion to dismiss. Mr. Abrego advances both (1) actual and (2) unrebutted presumptive vindictiveness theories here. And while granting his motion, the District Court noted that the evidence adduced thus far "comes close" to establishing "actual vindictiveness." Mem. Op., R. 312, #5095. But it did not need to resolve that issue because it held that Mr. Abrego's presumptive vindictiveness theory was meritorious.

A reversal here would push actual vindictiveness to the fore. During discovery, the government moved to quash Mr. Abrego's subpoenas of Blanche, Singh, and a third ODAG official, James McHenry. Faced with that filing, the District Court determined that it would be "prudent to proceed with an evidentiary hearing . . . limit[ed] . . . to *only* the second step of the prosecutorial vindictiveness analysis: whether the government can produce objective, on-the-record explanations for [Mr.] Abrego's prosecution that rebut[] the presumption of vindictiveness." Order, R. 281, #4685. The Court explained that if the government succeeded in rebutting the presumption of vindictiveness, "the burden will again shift back to [Mr. Abrego] to establish that the government's rationale for prosecuting him is pretextual and that his prosecution is actually vindictive." *Id.* In that event, the Court

explicitly noted that it would need to resolve the government's motion to quash. *Id.* If that motion is denied and Mr. Abrego obtains the full discovery to which he is entitled, he is confident he can show actual vindictiveness.

## CONCLUSION

The judgment of the District Court dismissing the indictment should be affirmed.

Dated: October 16, 2026

Respectfully submitted,

*s/ Jeffrey L. Fisher*
Jeffrey L. Fisher
HECKER FINK LLP
1019 E. 4th Place, 3rd Floor
Los Angeles, CA 90013
Telephone: (212) 763-0883
Fax: (212) 564-0883
jfisher@heckerfink.com

Sean Hecker
Jenna M. Dabbs
David Patton
Derek Wikstrom
Jeffrey Then
Thea Raymond-Sidel
Nicole Ng
Alexandra Kersley
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com

Rascoe Dean
SHERRARD ROE VOIGT
& HARBISON PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Telephone: (615) 742-4200
Fax: (615) 742-4539
rdean@srvhlaw.com

*Counsel for Defendant-Appellee*
*Kilmar Armando Abrego Garcia*

**CERTIFICATE OF COMPLIANCE**

I, Jeffrey L. Fisher, counsel for Defendant-Appellee and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached brief is proportionately spaced, has a typeface of 14 points or more, was prepared using Word for Microsoft 365, and contains 10,906 words.

Dated: October 16, 2026

*s/Jeffrey L. Fisher*
Jeffrey L. Fisher

## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

Pursuant to 6 Cir. R. 28(b) and 6 Cir. R. 30(g), Defendant-Appellee Kilmar Armando Abrego Garcia hereby designates the following relevant district court documents in the electronic record:

| Record Entry | Description | PageID# |
|---|---|---|
| 3 | Indictment | 3-12 |
| 105 | Defendant's Memorandum of Law in Support of Motion to Dismiss | 1230-1264 |
| 121 | Government's Response to Defendant's Motion to Dismiss | 1347-1381 |
| 138 | Memorandum Opinion | 1514-1529 |
| 147 | Government's Status Report | 1547-1553 |
| 178 | Government's Response in Opposition to Defendant's Motion to Compel | 1794-1816 |
| 178-1 | Supplemental Affidavit in Support of Response in Opposition to Defendant's Motion to Compel | 1817 |
| 181 | Government's Motion to Quash Subpoenas | 1827-1833 |
| 185 | Memorandum Opinion | 1849-1855 |
| 196 | Government's Witness List for Evidentiary Hearing | 1916-1917 |
| 197 | Government's Pre-Hearing Brief | 1918-1922 |
| 281 | Order Reserving Decision on Motion to Quash and Scheduling Evidentiary Hearing | 4683-4686 |
| 300 | Transcript of Evidentiary Hearing (Feb. 26, 2026) | 4813-4995 |
| 306 | Defendant's Post-Hearing Brief | 5010-5039 |
| 306-1 | Appendix A to Defendant's Post-Hearing Brief | 5040–5047 |

| Record Entry | Description | PageID# |
| --- | --- | --- |
| 307 | Government's Post-Hearing Brief | 5048-5071 |
| 312 | Memorandum Opinion | 5082-5113 |
| 313 | Order | 5114 |
| 314 | Notice of Appeal | 5118 |
| 315-1 | Gov't Ex. 1, Evidentiary Hearing (Feb. 26, 2026) | 5120-5133 |